Don W. STEPHENS, Commissioner of Insurance of the Commonwealth of Kentucky, in his capacity as Liquidator of Delta America Re Insurance Company, Plaintiff,

v.

AMERICAN HOME ASSURANCE COMPANY, et al., Defendants.

Don W. STEPHENS, Commissioner of Insurance of the Commonwealth of Kentucky, in his capacity as Liquidator of Delta America Re Insurance Company, Plaintiff,

v.

AMERICAN RISK MANAGEMENT, INC., et al., Defendants.

Don W. STEPHENS, Commissioner of Insurance of the Commonwealth of Kentucky, in his capacity as Liquidator of Delta America Re Insurance Company, Plaintiff,

v.

NATIONAL DISTILLERS AND CHEMICAL CORPORATION, et al., Defendants.

Don W. STEPHENS, Commissioner of Insurance of the Commonwealth of Kentucky, in his capacity as Liquidator of Delta America Re Insurance Company, Plaintiff,

v.

AMERICAN INTERNATIONAL INSURANCE COMPANY, et al., Defendants.

Nos. 91 Civ. 2898 (JSM) (KAR), 89 Civ. 2999 (JSM) (KAR), 91 Civ. 2901 (JSM) (KAR) and 91 Civ. 6245 (JSM) (KAR).

United States District Court, S.D. New York.

Jan. 26, 1993.

William F. Costigan, Anderson Costigan, New York City, James L. Gay, W. Henry Jernigan, Jr., Kevin M. McGuire, Jackson & Kelly, Lexington, KY, Jeffrey G. Steinberg, Serchuk & Zelermyer, White Plains, NY, David Klingsberg, Alan Goott, Michael Braff, Kaye, Scholer, Fierman, Kays & Handler, New York City, for plaintiff.

Patrick Watts, Gen. Counsel, Kentucky Dept. of Ins., Frankford, KY, for William W. Barton, Jr., James E. Dickinson.

Atty. Gen. of Ky., Robert V. Bullock, Asst. Atty. Gen., Frankfort, KY, for Daniel D. Briscoe, Gil McCarty.

Robert M. Watt, III, Stoll, Keenon & Park, Lexington, KY, William G. Primps, LeBoeuf, Lamb, Leiby & MaCrae, New York City, for American Risk Management, Inc., Frederick M. Reiss, Arthur H. Deters, Bryan D. Murphy, John J. Ryan.

Joseph Dailey, Lauren Selznick, Breed, Abbot & Morgan, New York City, Wyatt, Tarrant & Combs, Louisville, KY, Dandridge F. Walton, William A. Carey, Jeanne M. Box, Alagia, Day, Marshall, Mintmire & Chauvin, Frankfort, KY, for Quantum Chemical Corp. (National Distillers and Chemical Corp.).

William G. Primps, LeBoeuf, Lamb, Leiby & MaCrae, New York City, for International Risk Management Ltd., European Risk Management Ltd., Transnational Risk Management Ltd., Transnational Risk Management (Guernsey) Ltd.

John R. Oller, Wilkie, Farr & Gallagher, New York City, John T. Ballantine, Ogden, Sturgill and Welch, Louisville, KY, Dandridge F. Walton, William A. Carey, Jeanne M. Box, Alagia, Day, Marshall, Mintmire & Chauvin, Frankfort, KY, Joseph Dailey, Lauren Selznick, Breed, Abbot & Morgan, New York City, for Robert E. Norton.

Dandridge F. Walton, Jeanne M. Box, Alagia, Day, Marshall, Mintmire & Chauvin, Frankfort, KY, Joseph Dailey, Lauren Selznick, Breed, Abbot & Morgan, New York City, for John C. Aldin, F. Donald Brigham, Hugh C. Brewer, III, Roger W. Hill, Jr., Ramsey E. Joslin, Robert E. Norton, John F. Salisbury.

T. Bruce Bell, Fowler, Measle & Bell, Lexington, KY, for Richard F. Maynes, Terrence J. Reilly.

Charles D. Greenwell, D. Randall Gibson, Middleton & Reutlinger, Louisville, KY,

Thomas P. Parry, Donovan Parry Walsh & Repetto, New York City, for American Home Assur. Co., National Union Fire Ins., Birmingham Fire Ins. Co., Commerce & Industry Ins. Co. of Canada, The Ins. Co. of the State of Pennsylvania.

Mark R. Feather, Brown, Todd & Heyburn, Louisville, KY, for Universal Reinsurance Corp., Syndicate 33, I.N. Thomson, Syndicate of Lloyds of London, Irish Nat. Ins. Co., PWS Group, Continental Ins. Co.

Cynthia B. Maddox, David A. Brill, Goldberg & Simpson, Louisville, KY, for Fremont Indem. Co.

Thomas R. Newman, Thomas M. Bower, Newman & Bower, P.C., New York City, for Aegis Indem. Ltd., Bakerlooe Ins. Co., Ltd., Berda Developments Ltd., Brittany Ins. Co., Ltd., Centennial Assur. Co., Ltd., Conoplex Ins. Co., Ltd., Constantine Ins. Co., Ltd., Elco Ins. Co., Ltd., Elwood Ins., Ltd., General Ins. Co. Ltd., Horizon Ins. Co., Ltd., Riscott Ins. Ltd., Ross Ins., Ltd., Sperry Ins. Co., Ltd., Three Rivers Ins. Co., Trochus Ins. Co. Ltd., Twinsurance Ltd., United Ins. Co., ver Bes' Ins. Co., Westburne Ins. Co.

John M. Newman, Jr., Jones, Day, Reavis & Pogue, Cleveland, OH, for Saturn Ins. Co., Ltd.

Robert H. Werbel, Werbel, McMillin & Carnelutti, New York City, for Trafford Park Ins., Ltd.

William G. Primps, LeBoeuf, Lamb, Lieby & MacRae, New York City, for Transnational Ltd.

David Hebbeler, Edward Boyle, Perry Kreidman, Wilson, Elser, Maskowitz, Edelman & Dicker, New York City, for Arion Ins. Co., Ltd., Assubel Accidents et Dommages, Bradesco Seguros (formerly Atlantica CIA National de Seguros), Banco de Seguros del Estado (also known as BSE Banco de Seguros Del Estado), Caisse Mutuelle D'Assurances et de Prevoyance, Central Reinsurance Corp., Chiyoda Fire & Marine Ins. Co., Ltd., CIA Internacional de Seguros, Hassneh Ins. Co. of Israel, Ltd., Instituto de Resseguros do Brazil (also known as I.R.B. Inst. De Ress. Do Brazil), Korean Reinsurance Corp., Kyoei Mutual Fire & Marine Ins. Co., Ltd., Presence Assurances, Mingtai Fire & Marine Ins. Co., Ltd., The Nippon Fire & Marine Ins. Co., Ltd., Overseas Union Ins. Ltd., Pohjola Group, Seguros la Provincial, S.A., SNL Ins., Ltd. (in liquidation), Transport Industries Ins. Co., Ltd.

Elliott M. Kroll, Mark S. Fragner, S.M. O'Brien, III, Kroll & Tract, New York City, for Canadian Union Ins. Co., Chung Kuo Ins. Co.

Leo W. Fraser, III, Mendes & Mount, New York City, for Ca de Seguros Orinoco, C.A. Reaseguradora Internacional del Orinoco, Fuji Fire and Marine Ins. Co., Ltd., Ins. Co. of the USSR, Ltd., Owens Ins., Ltd., Provident Assur. Co.

Larry W. Thomas, Cameron & Hornbostel, New York City, Gregory J. Bendlin, Cameron & Hornbostel, Washington, DC, for Companhia Bandeirante de Sequros Gerais (Bandeirante) and Grupo de Empresa's Segura-doras Brasileiras (GESB).

Kevin Cavalere, Jackson & Nash, Frances Phillips, Adams, Duque & Hazeltine, James Veach, Mound, Cotton & Wollan, New York City, Craig C. Corbitt, Furth, Fahrner & Mason, San Francisco, CA, for Elizabeth Wright on counterclaim.

## OPINION AND ORDER

MARTIN, District Judge:

*Background*

Elkhorn Reinsurance Company ("Elkhorn") was incorporated in Kentucky on October 7, 1965, for the purpose of insuring the property and casualty risks of National Distillers and Chemical Corporation, now known as Quantum Chemical Corporation ("Distillers"). In 1972 Elkhorn expanded its business and began assuming reinsurance risks of unrelated third parties. Elkhorn's outside business consisted of reinsuring these primary insurers and ceding portions of risks it took on to secondary reinsurers, also known as "retrocessionaires."

On September 30, 1983, Distillers sold a portion of Elkhorn to Delta Holdings, Inc. ("Delta Holdings"). Under the sale agreement Elkhorn was reorganized into two

corporations, DR Insurance Company and Delta America Re Insurance Company ("Delta Re"). DR Insurance Company was retained by Distillers to operate the captive insurance business of Distillers, and Delta Holdings obtained Delta Re to operate its business of reinsuring risks of unrelated third parties. In this opinion, "Delta Re" will sometimes be used to refer to both Elkhorn Reinsurance Company, *i.e.* the entity existing before September 30, 1983, and Delta America Re Insurance Company, the entity existing after such date, when such reference is appropriate.

In 1985, Delta Re was declared insolvent. After a brief period of rehabilitation, the company was placed in liquidation proceedings on September 15, 1985. Don W. Stephens, in his capacity as liquidator (the "Liquidator"), has instituted these four actions, as well as others, in connection with the insolvency proceedings. The following is a brief summary of each action:[1]

1. *Stephens v. National Distillers & Chem. Corp.*, 91–Civ–2901 (The "Distillers" case)

The Liquidator seeks recovery from Distillers of dividends paid by Elkhorn from 1981 to 1983, claiming that Elkhorn's insolvency during that period renders such dividends illegal. Summary judgment was granted to the Liquidator on this claim by a Kentucky state court, which judgment is the subject of a motion here.

The Liquidator also named certain retrocessionaires who reinsured Elkhorn/Delta Re before 1984 (the "Elkhorn Retrocessionaires"), seeking full coverage under the reinsurance contracts between them and the insolvent. The Elkhorn Retrocessionaires defend on the basis of fraud and seek rescission.

2. *Stephens v. American Risk Management*, 89–Civ–2999 (The "ARM" case)

The Liquidator seeks coverage from certain retrocessionaires who signed reinsurance contracts with Delta Re in 1984 and 1985 ("Delta Re Retrocessionaires"). As in

the Distillers case, the Delta Re Retrocessionaires defend on the basis of fraud and seek rescission. If such relief is granted, the Liquidator seeks to hold liable, *inter alia*, persons who managed Delta Re after the sale ("Management Defendants"). These Management Defendants have impleaded Distillers and certain officials of the Kentucky Department of Insurance.

3. *Stephens v. American Home Assurance Co.*, 91–Civ–2898 (The "American Home" case)

The Liquidator seeks premiums from companies which ceded insurance risks to Delta Re in 1984 and 1985 (the "Delta Re Cedents"). As in the ARM case, the Delta Re Cedents claim fraud and seek rescission, and the Liquidator named Management Defendants in the alternative, who impleaded Distillers and Kentucky officials. The Kentucky officials, however, were dismissed by the Kentucky Federal District Court before it transferred this case here, which dismissal is contested.

4. *Stephens v. American International*, 91–Civ–6245 (The "American International" case)

The Liquidator seeks premiums from ceding companies contracting with Elkhorn before 1984 (the "Elkhorn Cedents").

The Second Circuit's recent opinion in *Delta Holdings, Inc. v. National Distillers & Chem. Corp.*, 945 F.2d 1226 (2d Cir. 1991), *cert. denied*, — U.S. —, 112 S.Ct. 1671, 118 L.Ed.2d 390 (1992), provides further relevant background. There, Delta Holdings sued Distillers for rescission of the sale of Delta Re, claiming common law fraud and violation of securities laws, *inter alia*. The Second Circuit found that no fraud had been committed as to Delta Holdings, and reversed the district court's grant of rescission. Reference is made to that decision throughout this opinion, and familiarity with it is assumed.

---

**1.** Descriptions may be incomplete as regards causes of action or defenses; the summary is

provided solely for the purpose of discussing the instant motions.

Further background will be provided in discussion of the motions to which it is relevant.

### Summary of Present Motions

In the Distillers, ARM and American Home cases, the Liquidator moves to certify to the Kentucky Supreme Court the question of whether rescission is available as a remedy after an insurance company has gone into liquidation proceedings, pp. 945–47. Absent certification, the Liquidator moves for judgment on the pleadings against the Elkhorn and Delta Re Retrocessionaires and the Delta Re Cedents for a determination that rescission is not available, pp. 945–48.

The Elkhorn Retrocessionaires move for summary judgment against the Liquidator in the Distillers case on their defenses of fraud and illegality to the claims against them, pp. 948–50. Distillers moves for summary judgment against the Elkhorn Retrocessionaires on their cross-claims against Distillers in the Distillers case, pp. 950–56, and also to vacate or reconsider the Kentucky state court summary judgment rendered against it in favor of the Liquidator, pp. 956–58.

Some of the Elkhorn Cedents move to dismiss the claims filed against them by the Liquidator in the American International case, pp. 958–60. The Kentucky state official third-party defendants in the ARM case move for dismissal of the Management Defendants' claims against them, pp. 960–63, while the Management Defendants seek reconsideration of such dismissal in the American Home case, pp. 963–64.

These motions will be considered *seriatim*.

### Liquidator's Motion for Certification/Judgment on the Pleadings

In the Distillers, ARM, and American Home cases, The Liquidator moves to certify to the Kentucky Supreme Court the question of whether rescission and the defense of fraud are available after liquidation proceedings have been initiated, and in the alternative, for an order disallowing the retrocessionaires' and cedents' defenses of fraud and barring their claims of rescission as a matter of law.

Defendants are retrocessionaires and cedents who engaged in reinsurance transactions with Elkhorn/Delta Re. The Liquidator is suing them for provision of coverage and payment of premiums, respectively, pursuant to various contracts. The defendants defend on the basis of fraud, and have counter-claimed for rescission. They claim that Elkhorn/Delta Re was insolvent as early as 1980, and its failure to disclose this and other facts material to the reinsurance contracts renders the contracts void and unenforceable.

The Liquidator claims that such claims are barred as a matter of law. Contending that this matter is governed by Kentucky insurance insolvency laws, the Liquidator seeks to have certified to the Kentucky Supreme Court this question:

> Whether Kentucky's comprehensive scheme for marshalling and distributing the assets of insolvent insurers—the Kentucky Insurers Rehabilitation and Liquidation Act—displaces any common law right of rescission that might otherwise be available to a party who dealt with the insolvent?

Failing that, the Liquidator moves for judgment on the pleadings as to whether rescission and the defense of fraud are available as a matter of law.

### Choice of Law

■ A federal court, sitting in diversity, normally applies the conflict of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.*, 887 F.2d 437, 439 (2d Cir.1989). Likewise, where federal jurisdiction is derived from the Federal Sovereign Immunities Act the conflict of law rules of the forum state govern. *Barkanic v. General Admin. of Civ. Aviation of the People's Republic of China*, 923 F.2d 957, 959–61 (2d Cir.1991). However, in a case that has been transferred pursuant to 28 U.S.C. § 1404(a), the court should apply the law of the transferor court's forum state. *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct.

805, 11 L.Ed.2d 945 (1964); *Spar, Inc. v. Information Resources, Inc.,* 956 F.2d 392, 395 (2d Cir.1992); *Shamley v. ITT Corp.,* 869 F.2d 167, 171 (2d Cir.1989). Since the Distillers and American Home cases were originally filed in Kentucky and later transferred here, Kentucky's conflict of law rules apply under *Van Dusen,* even though New York is the forum state. On the other hand, the ARM case was filed in this district, requiring an application of New York conflict of laws.

■ Kentucky courts apply a "most significant relationship" test to settle conflict of law questions. *Breeding v. Massachusetts Indem. & Life Ins. Co.,* 633 S.W.2d 717 (Ky.1982); *Lewis v. American Family Ins. Group,* 555 S.W.2d 579 (Ky.1977). " 'The modern test is which state has the most significant relationship to the transaction and the parties.' " *Id.* at 581–82, quoting Restatement (Second) of Conflict of Laws, § 188 (1971). "Justice, fairness and the best practical result may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Breeding,* 633 S.W.2d at 719, citing *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963).

■ "New York courts apply an 'interest analysis' to choice of law issues involving contractual disputes, *see Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969); *see also Hutner v. Greene,* 734 F.2d 896, 899 (2d Cir.1984), and, therefore, 'the law of the jurisdiction having the greatest interest in the litigation will be applied.' *Daystrom,* 24 N.Y.2d at 382, 300 N.Y.S.2d at 825, 248 N.E.2d at 582." *Arkwright–Boston,* 887 F.2d at 439 (choice of law in reinsurance contract dispute).

■ It is clear that New York has the most significant relationship to, and the greatest interest in, the present issue. All retrocession agreements were solicited, negotiated, executed, and performed in New

York and the intermediary, Paul Napolitan, Inc., is located in New York.

The Kentucky Court of Appeals, in the context of a personal jurisdiction issue, characterized the relationship of the State of Kentucky to some of these transactions as follows:

[Delta]'s principal offices, records and personnel were removed to New York City [in 1983] and all business was conducted from that location. The record before us reflects that even though Delta did business both foreign and domestic, there is no absolutely no indication that it was engaged in any activity in the Commonwealth until it became insolvent, or, in other words, ceased doing active business.

*Sullivan Payne Co. v. McCarty,* No. 86–CA–2998–MR, slip op. at 2 (Ky.Ct.App. 1990). While this opinion expressly reserved judgment on conflict of law issues, it clearly indicated the lack of a relationship between Kentucky and the transactions relevant to this motion.

The only relationship Kentucky bears to this entire litigation relates to the insolvency proceedings. Because Delta Re is a Kentucky corporation, Kentucky's liquidation statutes govern Delta Re's insolvency proceedings. Thus, Kentucky has a significant relationship to and interest in all issues arising from the insolvency.

■ However, the defense of fraud in the inducement and the equitable rescission of a contract due to fraud are declarations that the contract was void *ab initio.* *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.,* 979 F.2d 268, 278 (2d Cir.1992); *Eastern Dist. Piece Dye Works, Inc. v. Travelers Ins. Co.,* 234 N.Y. 441, 138 N.E. 401 (1923). The validity of a contract must be determined by reference to the laws of the state that has the most significant relationship with and greatest interest in its formation, rather than the state in which its enforcement is sought. If there were no valid contracts in the first place, the Liquidator could hardly attempt to enforce them regardless of authority granted by Kentucky's statutes. Since Kentucky had no relationship, significant or otherwise,

with the formation of the contracts, and New York's relationship is overwhelming, Kentucky conflict of law rules dictate that New York substantive law applies to whether the defense of fraud and the remedy of rescission are available in the Distillers and American Home cases. Likewise, since New York has the greatest interest in a determination of the validity of the contracts, New York conflict of laws rules dictate that New York substantive law applies in the ARM case.

Certification

Because New York law governs these issues, the motion for certification to the Kentucky Supreme Court is denied.

Availability of Rescission After Insolvency

■ As the Second Circuit observed in *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268 (2d Cir.1992):

> The relationship between a reinsurer and a reinsured is one of utmost good faith, requiring the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware. In certain cases, the description of items covered under the original policy may be so imprecise as to warrant rescission of the contract because the reinsurer was not adequately apprised of the risk.

979 F.2d at 278 (citations omitted).

■ It is clear that, were it not for the insolvency of Delta Re, rescission and the defense of fraud would be available. *Sumitomo Marine & Fire Ins. Co. v. Cologne Reinsur. Co. of Am.*, 75 N.Y.2d 295, 303, 552 N.Y.S.2d 891, 895, 552 N.E.2d 139, 143 (1990); *New York Bowery Fire Ins. Co. v. New York Fire Ins. Co.*, 17 Wend. 359 (N.Y.1837); *Royal Indem. Co. v. Preferred Acc. Ins. Co.*, 243 A.D. 297, 276 N.Y.S. 313 (1st Dept.1934), *aff'd*, 268 N.Y. 566, 198 N.E. 407 (1935). Indeed, the Liquidator has conceded this point. Thus, the question becomes whether the insolvency of Delta Re renders the remedy of rescission and/or the defense of fraud unavailable as a matter of New York law.

■ The general rule is that a liquidator of an insurance company "stands in the shoes" of the insolvent, gaining no greater rights than the insolvent had. *Bohlinger v. Zanger*, 306 N.Y. 228, 117 N.E.2d 338 (1954); *Corcoran v. National Union Fire Ins. Co.*, 143 A.D.2d 309, 532 N.Y.S.2d 376, 387 (1st Dept.1988). Thus, absent specific law to the contrary, "the reinsurers are free to assert any affirmative defenses, such as fraud, that they may have had against the [insolvent company]." *In re Union Indem. Co.*, No. 41292–85, slip op. at 12 (N.Y.Sup.Ct. October 28, 1992).

The New York Court of Appeals has held that the defense of set-off survives insolvency proceedings, despite the argument that the debts were not mutual because the liquidator was a different legal entity from the insolvent company. *In re Midland Ins. Co.*, 79 N.Y.2d 253, 582 N.Y.S.2d 58, 590 N.E.2d 1186 (1992). In so holding, the court said:

> [L]iquidation cannot place the liquidator in a better position than the insolvent company he takes over, authorizing him to demand that which the company would not have been entitled to prior to liquidation. Defendant concedes that before Midland was adjudged insolvent Kemper Re had the right to set off the treaty premiums against the amount owed under the Playtex contract. Those rights were not altered merely because a liquidation order was entered.

582 N.Y.S.2d at 64, 590 N.E.2d at 1192 (citations omitted). While *Midland* was an interpretation of a statutory defense of set-off, *see* N.Y.Ins.Law § 7427, as opposed to the common law defense of fraud or remedy of rescission, the analysis of the Court of Appeals is distinctly relevant to the instant issue.

Indeed, *Midland* has been the basis for a New York Supreme Court's ruling on the precise issue before this Court. *See Union Indemnity*. There, although finding the affirmative relief of rescission barred by an injunction previously issued by the court, the court held that the defense of fraud was available to a reinsurer whose contrac-

tual obligations the liquidator sought to enforce. Citing *Midland,* the Supreme Court ruled that "the reinsurers are free to assert any affirmative defenses, such as fraud, that they might have had against [the insolvent company]." *Id.,* slip op. at 12.

The New York Court of Appeals has also recently held that an insured's contractual right to notification of cancellation of coverage survives a declaration of insolvency. *In re Transit Casualty Co.,* 79 N.Y.2d 13, 580 N.Y.S.2d 140, 588 N.E.2d 38, *cert. denied,* — U.S. —, 113 S.Ct. 199, 121 L.Ed.2d 141 (1992). Ruling that "nothing in the [Uniform Insurer's Liquidation] Act obligates states subscribing to its terms to abandon statutory or decisional law requiring notice of cancellation to be sent to policyholders before an insurance contract is cancelled," the Court of Appeals found that the contractual right of notification, having vested prior to liquidation proceedings, was not extinguished by them. 79 N.Y.2d at 20, 580 N.Y.S.2d at 144, 588 N.E.2d 38.

Thus, New York courts have been strongly supportive of preserving rights which existed prior to liquidation proceedings. As illustrated by *Union Indemnity,* the defense of fraud and the remedy of rescission for fraudulent inducement are included in this protection. While no determination is made at this time as to the merits, it is clear they are not rendered unavailable as a matter of New York law by the mere fact of insolvency proceedings.[2]

*Retrocessionaires' Summary Judgment Motion*

Retrocessionaires in the Distillers case move for summary judgment on their defense of fraud based on material misstatements and/or omissions made by Elkhorn,

and on their defense of illegality based on Delta Re's insolvency at the time of contracting.

Background

The insolvency of Delta Re, and the failure to discover it quickly, stemmed primarily from the difficulty in calculating and monitoring the accuracy of loss reserves carried by insurance companies. While a complete discussion of these problems and their relation to Delta Re is contained in the Second Circuit *Delta Holdings* opinion, 945 F.2d at 1228–40, a brief explanation of some of these factors is required to put these motions in context.

Because future claims will be a drain on an insurer's resources, insurance companies are required to carry "loss reserves" as liabilities. These loss reserves are intended to estimate the value of claims which will be paid on policies which the company is carrying. Loss reserves consist of both "case reserves" and "incurred-but-not-reported reserves", or "IBNR" reserves. Case reserves are reserves established upon the filing of a claim; since not every claim will be fully paid, case reserves are only estimated losses on these claims. However, they are at least substantially predictable.

IBNR reserves, on the other hand, are reserves set aside before claims are even filed. Thus IBNR reserves are extremely conjectural, and may need adjustment as time passes and their accuracy can be tested in retrospect.

In February, 1982 Elkhorn received from Tillinghast, Nelson & Warren ("Tillinghast") a report (the "February Report") commissioned by Elkhorn which recommended a method by which to calculate IBNR reserves different from the method

---

**2.** Out-of-state cases cited by the Liquidator stand for the proposition that the remedy of rescission may not be equitable in a given case where the rights of innocent third parties may be affected. *See, e.g., In re Security Casualty Co.,* 127 Ill.2d 434, 130 Ill.Dec. 446, 537 N.E.2d 775 (1989); *Glacier Gen. Assur. Co. v. Casualty Indem. Exch.,* 435 F.Supp. 855 (D.Mont.1977); *Smith v. Schwartz,* 398 Pa. 555, 159 A.2d 220 (1960). Only one case, *Garamendi v. Abeilla–Parx Re-* *assur.,* No. C 683233 (Ca.Super.Ct. June 25, 1991), states that rescission should be unavailable as a matter of law after insolvency, and to the extent, if any, that it is still good law in light of the subsequent case of *Prudential Reinsur. Co. v. Superior Court of Los Angeles County,* 3 Cal. 4th 1118, 14 Cal.Rptr.2d 749, 842 P.2d 48 (1992) (adopting rationale of *Midland* ), it is unpersuasive and nonbinding.

Elkhorn was then using. Appended to the report, at Elkhorn's request, was a series of worksheets with data from Elkhorn's operations filled in, by which one could calculate Elkhorn's recommended IBNR reserves under this new method. Although these calculations were not completed, again at Elkhorn's request, it was established in *Delta Holdings* that they would have indicated an IBNR reserve recommendation $10 million higher than the one Elkhorn was currently carrying.

In April, 1982 Elkhorn requested that Tillinghast prepare another report (the "April Report") on three reinsurance contracts which had not been considered in the February Report. The April Report, which unlike the February Report completed all calculations, indicated that the $2.3 million IBNR reserves Elkhorn was carrying for these three contracts were deficient by $10.9 million. In response, Elkhorn purchased a $10 million loss transfer policy in order to offset the bulk of the deficiency.

Discussion

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ The Retrocessionaires claim that the concealment of the two Tillinghast reports and Elkhorn's insolvency violated Elkhorn's duty of utmost good faith, and thus rendered the contracts void *ab initio*. In order to defend, the Retrocessionaires must show that Elkhorn failed to disclose a material fact of which it was aware. *Christiania*, 979 F.2d at 278–79.

With regard to Elkhorn's insolvency, the Retrocessionaires have failed to show that Elkhorn was in fact aware that it was insolvent at the times of contracting. That Elkhorn have known of the insolvency is a necessary precursor to its requirement to disclose all facts it has reason to believe are material. *See Christiania*, 979 F.2d at

279; *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Furthermore, the Second Circuit in *Delta Holdings* found that Elkhorn did not know of its insolvency at the time of its acquisition. 945 F.2d at 1242. Since, at present, there are no facts presented in this case that were not present in *Delta Holdings*, principles of *stare decisis* indicate that this conclusion be accepted here as well. Thus, summary judgment may not be granted based on Elkhorn's insolvency.

■ It is clear, however, that the Tillinghast reports were known to Elkhorn. Thus, if they were material, the contracts may be subject to rescission based on their non-disclosure. Under New York law, "[a] fact is material so as to void *ab initio* an insurance contract if, had it been revealed, the insurer or reinsurer would either not have issued the policy or would have only at a higher premium." *Christiania*, 979 F.2d at 278; *Merchants' & Shippers' Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 219 A.D. 636, 640–41, 220 N.Y.S. 514 (1st Dept.), *aff'd* 246 N.Y. 616, 159 N.E. 674 (1927).

While *Delta Holdings* discussed the materiality of the reports, it did so in a very different context. The Second Circuit found the text of the February Report non-material in that it merely presented information widely known and irrelevant to Elkhorn specifically. The appended worksheets, however, were found non-material for the distinct reason that by the time the acquisition was being contemplated, their data were outdated and stale, and would not have been considered. No comment was made on whether the worksheets would have been material at the time they were produced, albeit unfinished. The April Report, by contrast, would have been material but for the fact that its substance had already been disclosed to the purchaser. Thus, it is clear that the findings in *Delta Holdings* as to the materiality of the reports are not determinative here, where

the timing of disclosure differed and different information was transmitted.[3]

Neither report can be said to be material as a matter of law. Although the April Report disclosed a $10.9 million deficiency in loss reserves, Elkhorn attempted to compensate for this problem by purchasing a loss transfer policy. Given that this information had been disclosed to Delta Holdings in the context of the acquisition and apparently did not present a problem, it is not certain that the report, in light of the purchase of the loss transfer policy, was material.

■ Likewise, the materiality of the February Report is not conclusively established. While finishing the calculations may have disclosed an additional $10 million deficiency, it cannot be said as a matter of law that Elkhorn should reasonably have expected such action to be taken if it had made the report available to its reinsurers. "An actuary coming upon the February Report would not have bothered to complete the appended worksheets but would simply have assumed that any relevant data contained in the appended worksheets would either be reflected in the December 31, 1982 and June 30, 1983 triangles or supplanted by treaty-category data." *Delta Holdings*, 945 F.2d at 1243. Similarly, a reinsurer seeing the worksheets in March, 1992 might have believed the calculations to be unnecessary, in that Elkhorn had already made IBNR figures available, albeit using a different calculation method. There has been no evidence that Elkhorn should reasonably have known that the worksheets would have been relevant to a reinsurer.

Conclusory and self-serving statements from individual Retrocessionaires that they would not have reinsured Elkhorn or would have charged a higher premium if they had known of the Tillinghast reports are not sufficient for this summary judgment motion. As discussed *supra,* these statements are not sufficient to find, as a matter of law, that Elkhorn should reasonably

have anticipated the relevance of the worksheets in the February Report, or that knowledge of both the April Report and the stop loss policy would have affected the decisions of the retrocessionaires. The materiality of the reports is not so obvious that it can be said as a matter of law that Elkhorn should have known of it. This question of fact is best addressed on a full record.

■ The Elkhorn Retrocessionaires also contend that the contracts are unenforceable because they were illegal when entered into, in that Elkhorn was conducting business while technically insolvent, and thus in violation of Kentucky and New York statutory minimal capital requirements for insurance companies. Under New York law, however, "[i]f the statute does not expressly provide that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy ... the right to recover will not be denied." *John E. Rosasco Creameries v. Cohen,* 276 N.Y. 274, 278, 11 N.E.2d 908 (1937). "Allowing parties to avoid their contractual obligation is especially inappropriate where there are regulatory sanctions and statutory penalties in place to redress violations of the law." *Lloyd Capital Corp. v. Pat Henchar, Inc.,* 80 N.Y.2d 124, 128, 589 N.Y.S.2d 396, 398, 603 N.E.2d 246, 248 (1992).

Thus, the Retrocessionaires cannot avoid their contractual obligations merely because Elkhorn was insolvent when it entered into them, since the statutes do not expressly render them unenforceable and allowing such avoidance would not be consonant with sound public policy. *See id.*

*Distillers' Motion for Summary Judgment*

Distillers moves for summary judgment in the Distillers case on the cross-claims of the Elkhorn Retrocessionaires.[4]

---

**3.** Indeed, the Second Circuit recognized this limitation in saying, "We do not address the materiality of documents such as the Tillinghast Reports in the context of a differently struc-

tured transaction or less sophisticated investors." *Delta Holdings,* 945 F.2d at 1243.

**4.** Two groups of Retrocessionaires submitted briefs in opposition to Distillers' motion for

The Retrocessionaires claim that Distillers is liable for any losses they may sustain under the retrocession contracts on the grounds that (1) Distillers is vicariously liable as Elkhorn's parent for Elkhorn's fraudulent and/or negligent actions with respect to the Retrocessionaires under a theory of "piercing the corporate veil", and (2) Distillers is directly liable to the Retrocessionaires as a result of its own conduct. These claims will be addressed separately.

Discussion

 In a summary judgment motion, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The *Celotex* Court held that a moving party does not have to support its "motion with affidavits or other similar materials negating" the claim where the non-movant will bear the burden of proof on that issue at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. Rather, the burden is on the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, the non-moving party must "produce sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 349, 106 S.Ct. at 2510, (citations omitted).

Choice of Law

 Prior to September 20, 1983, Elkhorn was a Kentucky corporation with its principal place of business in Louisville, Kentucky. In this case, the appropriate law to apply to the question of whether to pierce the corporate veil is the law of the state of incorporation, that is, Kentucky law. *See Poyner v. Lear Siegler, Inc.,* 542 F.2d 955, 958 (6th Cir.1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361

(1977) (applying Kentucky law); *Horowitz v. Southwest Forest Indus., Inc.,* 612 F.Supp. 179 (D.Nev.1985) (matters peculiar to relationship among corporation are internal affairs of corporation and governed by law of state of incorporation); *United States v. Daugherty,* 599 F.Supp. 671, 673 (E.D.Tenn.1984) (piercing corporate veil must be determined with reference to law of state of incorporation).

On the other hand, the contracts with the Retrocessionaires were entered into in New York, with virtually all relevant events taking place there. As discussed *supra* in the context of the motion for judgment on the pleadings, New York law will control issues of agency and contractual liability.

Piercing the Corporate Veil

Judges and commentators have long recognized that the theories associated with the question of whether to pierce the corporate veil "are usually stated in broad terms that offer little guidance to judges or litigants in subsequent cases." Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study,* 76 Cornell L.Rev. 1036 (1991); *see also Berkey v. Third Ave. Ry.,* 244 N.Y. 84, 155 N.E. 58 (1926) (opinion by Cardozo, J.). In fact, one commentator has even acknowledged that the same facts appear in cases providing relief and cases denying relief. David C. Cummings, Comment, *Disregarding the Corporate Entity: Contract Claims,* 28 Ohio St.L.J. 441, 450 (1967).

 In Kentucky, the corporate veil should only be pierced "reluctantly and cautiously." *White v. Winchester Land Dev. Corp.,* 584 S.W.2d 56, 60–61 (Ky.Ct. App.1979). A corporation will be regarded as a separate legal entity except when "the idea of a separate legal entity is used to justify wrong, protect fraud or defend crime." *United States v. WRW Corp.,* 778 F.Supp. 919, 922 (E.D.Ky.1991); *Dare to Be Great, Inc. v. Commonwealth ex rel. Hancock,* 511 S.W.2d 224, 227 (Ky.Ct.App.

summary judgment. The first group consists of nineteen Retrocessionaires (the "Arion Retrocessionaires"), and the second group consists of two Retrocessionaires ("Bandeirante" and

"GESB"). Because both groups make similar arguments regarding the issue of piercing the corporate veil, these groups will collectively be referred to as "the Retrocessionaires."

1974). In evaluating whether to pierce the corporate veil Kentucky courts have utilized both the "alter ego" theory and the "instrumentality" theory. *White*, 584 S.W.2d at 60–61.

The alter ego theory provides that the corporate veil should be pierced when (1) not only is the corporation influenced by the owners, but also there is such unity of ownership and interest that their separateness has ceased; and (2) the facts are such that an adherence to the normal attributes of separate corporate existence, *i.e.* treatment as a separate entity, would sanction a fraud or promote injustice. *Id.* at 61–62.

The instrumentality theory provides that the corporate veil should be pierced when (1) the corporation was a mere instrumentality of the shareholders; (2) the shareholders exercised control over the corporation in such a way as to defraud or to harm the plaintiff; and (3) a refusal to disregard the corporate entity would subject the plaintiff to unjust loss. *Id.* at 61.

Kentucky courts, however, have acknowledged that the alter ego and instrumentality theories are not totally distinct. *Id.* As such, Kentucky courts have held that regardless of which theory is utilized, the party seeking to pierce the corporate veil has the burden of establishing that an injustice or a fundamental unfairness would result if the corporate veil were not pierced. The Retrocessionaires have failed to meet that burden, and have not "produced sufficient evidence ... for a jury to return a verdict" in their favor. *Anderson*, 477 U.S. at 349, 106 S.Ct. at 2510. Thus, Distillers' motion for summary judgment should be granted.

The *White* court stated that "issues of alter ego do not lend themselves to strict rules ... and whether the corporate veil should be pierced depends upon the innumerable equities of each case." *White*, 584 S.W.2d at 62. The *White* court listed factors that would indicate "unfair dealings." These factors include: (1) undercapitalization; (2) a failure to observe the formalities of corporate existence; (3)

nonpayment or overpayment of dividends; (4) a siphoning off of funds by the dominant shareholder(s); and (5) the majority shareholders having guaranteed corporate liabilities in their individual capacities. *Id.* at 62; *see also Daugherty*, 599 F.Supp. at 673 (utilizing above factors to determine whether to disregard the corporate veil); *WRW Corp.*, 778 F.Supp. at 923 (same).

## A. Undercapitalization

" 'Inadequate capitalization' means capitalization very small in relation to the nature of the business of the corporation and the risks the business necessarily entails." 1 Fletcher, Cyclopedia of the Law of Private Corporations § 44.1 (perm. ed. 1990); *accord Anderson v. Abbott*, 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944); *Lowell Staats Mining Co. v. Pioneer Urvan, Inc.*, 878 F.2d 1259, 1263 (10th Cir.1989); *Dewitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685 (4th Cir.1976). Thus, an examination of the adequacy of capitalization should entail a review of both initial capital contributions, and subsequent capital infusions prior to the corporation distinctly changing the nature or magnitude of its business. 1 Fletcher, *supra*, § 44.1.

The record indicates that Elkhorn was incorporated on October 7, 1965, for the purpose of insuring the property and casualty risks of Distillers. At that time, Distillers made an initial capital contribution of $900,000, which included $300,000 of paid-in capital and $600,000 of paid-in surplus. Affidavit of John F. Salisbury ¶ 3 ("Salisbury Aff."). This initial capital contribution was $450,000 more than the minimum capital requirement mandated under Kentucky law to qualify for authority to transact property and casualty insurance in Kentucky. On November 4, 1971, Distillers contributed an additional $300,000 of paid-in capital and an additional $1,100,000 of paid-in surplus. Salisbury Aff. ¶ 4. Subsequent to this capital infusion Elkhorn expanded its business and began assuming reinsurance risks of unrelated third parties.

Although the Retrocessionaires recognized the need to establish Elkhorn's

alleged undercapitalization, and identified available methods of computing whether a corporation was adequately capitalized,[5] the Retrocessionaires provided no affidavits or testimony substantiating Elkhorn's alleged undercapitalization. Instead, the Retrocessionaires relied on the fact that Elkhorn was insolvent during the period from 1980 to 1983, in order to illustrate that Elkhorn was undercapitalized.[6] However, a corporation that commences business with adequate capital and subsequently suffers insolvency is not undercapitalized as the term is used in a "piercing the corporate veil" question. 1 Fletcher, *supra*, § 44.1. *See also J–R Grain Co. v. FAC, Inc.*, 627 F.2d 129 (8th Cir.1980). Thus, the Retrocessionaires fail to set forth any specific facts to establish a question of fact as to whether Elkhorn was undercapitalized during the period from 1980 through 1983.

B. Failure to Observe Corporate Formalities

■ On January 1, 1975, Elkhorn and Distillers executed a Management Services Agreement (the "Management Agreement") under which Distillers agreed to manage the business of Elkhorn. The Retrocessionaires contend that the Management Agreement between Distillers and Elkhorn is *prima facie* evidence of the extent of Distillers' domination and control over Elkhorn, and therefore evidence of Elkhorn's failure to observe corporate formalities. Under the Management Agreement, Distillers rendered a variety of services to Elkhorn in exchange for a monthly

management fee.[7] Distillers' furnishing of these services, however, is not dispositive of the piercing the corporate veil question. "Common directorships are an inevitable consequence of a parent-subsidiary relationship," and do not alone justify piercing the corporate veil.[8] *American Commercial Lines, Inc. v. Ostertag*, 582 S.W.2d 51, 53 (Ky.Ct.App.1979); *accord C.L. & L. Motor Express Co. v. Achenbach*, 82 S.W.2d 335, 340 (Ky.Ct.App.1935). Likewise, that the two companies shared officers is not sufficient to show a failure to observe corporate formalities. *Poyner*, 542 F.2d at 958; *see United States Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 828 (4th Cir.1992); *United States v. Fidelity Capital Corp.*, 920 F.2d 827, 837 (11th Cir. 1991); *Lowell Staats*, 878 F.2d at 1263.

Distillers submitted an affidavit stating that the Board of Directors of Elkhorn met in Kentucky at least twice a year, that separate books and records were maintained by Elkhorn, that funds for operating expenses and capital expenditures were generated by the activities of Elkhorn, that all assets and funds of Elkhorn were segregated from the assets and funds of Distillers, that Distillers did not guarantee the liabilities of Elkhorn, and that Elkhorn and Distillers maintained separate bank accounts. Salisbury Aff. ¶¶ 6, 10–11. Thus, Elkhorn followed many of the corporate formalities that courts have examined in determining whether to pierce the corporate veil. *See Ostertag*, 582 S.W.2d at 53 (separate bank accounts favored not piercing corporate veil); *Craig v. Lake Asbestos*

5. The methods the Retrocessionaires identified include comparison of corporate finances with industry-wide ratios from published sources and expert testimony from certified public accountants. GESB's and Bandeirante's Memorandum in Opposition to Summary Judgment, Pg. 54. *See also Laya v. Erin Homes, Inc.*, 177 W.Va. 343, 352 S.E.2d 93, 101 (W.Va.1986) (undercapitalization tests include comparison of corporation ratios with industry ratios obtained from published sources).

6. Distillers has admitted that based on claim information currently available that Elkhorn's liabilities exceeded its assets during the period from 1980 through 1983.

7. The 1975 Management Agreement provided that National would supply Elkhorn with 1) administrative, management and supervisory services; 2) accounting service; 3) preparation of tax returns; 4) engineering services; and 5) purchasing of supplies, programming, budgeting, investment and financial planning, personnel and underwriting.

8. Specifically, John Salisbury was general counsel of Distillers and an Elkhorn Director, Robert Norton was a Vice–President of Distillers and President of Elkhorn, Ramsey Joslin was Chief Financial Officer of Distillers and Elkhorn, and James McGurty was head of the Distillers accounting department and Elkhorn's Controller.

*of Quebec, Ltd.,* 843 F.2d 145, 152 (3d Cir. 1988) (corporate veil not pierced when entities maintained separate books, records and bank accounts); *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1162 (5th Cir.1983) (corporate veil not pierced when companies maintained separate assets, books, ledgers, and bank accounts).

Finally, despite the existence of the Management Agreement, Elkhorn appears to have been a viable entity, and "not merely a facade for the operations of the dominant stockholder." *DeWitt Truck Brokers,* 540 F.2d at 687. There is no indication the Distillers financed Elkhorn's activities beyond its initial capital contributions. In fact, the level of compensation Elkhorn paid under the Management Agreement was adjusted annually to meet actual expenses.

For example, in 1975 Elkhorn paid Distillers $11,000 a month for services rendered under the Management Agreement. By 1982, however, the amount was $75,000 a month with an annual adjustment to actual costs. Affidavit of Perry Kreidman, Exhibit D (minutes of 1981 Elkhorn Board of Directors meeting) ("Kreidman Aff."). Moreover, the level of compensation was again adjusted during the following year. In 1983, Elkhorn was paying Distillers one-twelfth of the estimated annual expenses each month with adjustments to actual expenses at year end. *Id.* at Exhibit D (minutes of 1982 Elkhorn Board of Directors meeting).

■ Although it is apparent that under the Management Agreement Distillers exercised a large measure of control over the activities of Elkhorn, "mere ownership and control over the corporation by persons sought to be held liable is not alone a sufficient basis for denial of entity treatment." *Poyner,* 542 F.2d at 958. Thus, although the Management Agreement provided proof of Distillers' control over Elkhorn, it failed to present an issue of fact as to how Distillers' dominance resulted in a fundamental unfairness to the Retrocessionaires.

### C. Overpayment of Dividends or a Siphoning Off of Funds

The Retrocessionaires next argue that Distillers' receipt of dividends from Elkhorn during a period when Elkhorn was insolvent, that is, between 1980 and 1983, provides evidence that Distillers' siphoned off Elkhorn's funds, and caused Elkhorn's insolvency. The Retrocessionaires rely on the fact that Robert Norton ("Norton"), while working as President of Elkhorn and Vice-President of Distillers, recommended that Elkhorn pay dividends to Distillers for the 1980, 1981 and 1982 fiscal years. *See* Kreidman Aff. Exhibit D (minutes of Elkhorn Board of Directors meetings 1981 & 1982).

At first glance the Retrocessionaires appear to have a strong argument. However, the Second Circuit concluded in *Delta Holdings* that Elkhorn's president had no knowledge of Elkhorn's insolvency during the period that the dividends were declared. 945 F.2d at 1242. The Retrocessionaires have produced no additional evidence in contradiction of this finding.[9]

Thus, in order for the Retrocessionaires to establish specific facts showing a genuine issue for trial, the Retrocessionaires must establish that the dividends that Elkhorn declared were excessive in light of Elkhorn's reported yearly earnings. Here, during the seven year period between 1977 and 1983, Elkhorn declared dividends that amounted to an average of 21.8% of Elkhorn's net income. Salisbury Aff. Exhibit B (summary of Elkhorn's income, dividends and capital). The Retrocessionaires, however, fail to provide any evidence that Elkhorn's dividend payout ratio was excessive as compared to other similarly situated reinsurance companies.

### D. Guarantee of Corporate Liabilities in Individual Capacities.

There is no indication that Distillers ever guaranteed any of Elkhorn's liabilities in

---

**9.** The summary judgment rendered by the Kentucky state court and upheld here, *see infra,* requiring Distillers to repay these dividends is not relevant to this question. That decision was grounded on the mere *fact* of insolvency, rather than any finding as to the knowledge of Elkhorn and Distillers.

its individual capacity. In fact, under the Management Agreement, Distillers expressly disclaimed responsibility for Elkhorn's obligations.

The Retrocessionaires have thus failed to produce any evidence establishing that a fundamental unfairness or injustice will result without a piercing of the corporate veil. Accordingly, Distillers will not be held liable on such theory.

Other Grounds for Liability

The Retrocessionaires claim that there are grounds for holding Distillers liable apart from piercing the corporate veil. In their cross-complaints, they alleged that:

> National Distillers, pursuant to its management contract with Elkhorn, its voluntary acceptance and performance of the duties owed by Elkhorn to the retrocessionaires, and its domination and control of Elkhorn for its own purposes and advantages, assumed and purported to discharge the duties owed by Elkhorn to the retrocessionaires under the contracts.
>
> \* \* \* \* \* \*
>
> Pursuant to its management contract with Elkhorn, its voluntary acceptance and performance of all duties owed by Elkhorn to the retrocessionaires, and its domination and control of Elkhorn for its own purposes and advantages, National Distillers had a fiduciary duty to the retrocessionaires ...

Amended Answer & Cross–Claims of Arion Retrocessionaires ¶¶ 59, 62.[10]

The Retrocessionaires have elucidated the legal theories of liability in their briefs responding to this motion: (1) That Distillers took on a duty to perform the contracts and a fiduciary duty to the Retrocessionaires as a result of the Management Agreement, presumably because the Retrocessionaires were third-party beneficiaries of the Management Agreement, or by voluntarily assuming and performing such duties; (2) That Distillers' pervasive "domination and control of Elkhorn" rendered Elkhorn merely an agent for Distillers,

thus making Distillers liable as a principal; and (3) That Distillers is liable for Elkhorn's alleged fraudulent conduct with respect to the Retrocessionaires because they actively acquiesced in, or aided and abetted, such fraud.

■ The first theory, that Distillers' liability arises under the Management Agreement or by Distillers' actions, cannot survive a summary judgment motion. It cannot be said, and the Retrocessionaires point to no evidence which indicates, that Distillers and Elkhorn entered into the Management Agreement to benefit the Retrocessionaires, or that Distillers voluntarily assumed any duties which Elkhorn owed to the Retrocessionaires under the contracts. The language of the Management Agreement specifically contradicts such an assertion. Section 3 of the Management Agreement states in part, "National [Distillers] shall not, by reason of this Agreement or anything done or intended to be done by it in the performance thereof, be or become responsible for any debts, liabilities or other obligations of Elkhorn ..." Thus, there is no issue of material fact as to whether Distillers assumed any duties owed by Elkhorn by virtue of the Management Agreement or its actions.

■ The Retrocessionaires also claim that, due to the domination and control exerted by Distillers over Elkhorn, an agency was created which obligated Distillers for obligations taken on by Elkhorn. It is unclear how the standards for such a *de facto* agency based on "domination and control" differ from the factors required to pierce the corporate veil, if at all:

> A corporation ... may become an actor in the whole business of a subsidiary. When this occurs it will be legally responsible (*Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142). A subsidiary corporation over which the parent corporation exercises control in every day operations may be deemed an instrumentality or agent of

---

**10.** *See also* Second Amended Answer & Cross–Claims of Bandeirante ¶¶ 41, 44 (alleging fiduciary duty due only to management and con-

trol); Second Amended Answer & Cross–Claims of GESB ¶ 42 (same).

the parent (*Rapid T. Subway Constr. Co. v. City*, 259 N.Y. 472, 182 N.E. 145). The determinative factor is whether the subsidiary corporation is a dummy for the parent corporation (*Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983; *Astrocom Electronics Inc. v. Layfayette Radio Electronics Corp.*, 63 A.D.2d 765, 404 N.Y.S.2d 742).

*A.W. Fiur Co. v. Ataka & Co.*, 71 A.D.2d 370, 422 N.Y.S.2d 419, 422 (1st Dept. 1979).[11] While a failure to pierce the corporate veil does not preclude a finding of agency, *see Jackam v. Hospital Corp. of Am. Mideast*, 800 F.2d 1577, 1580 (11th Cir.1986), the theory under which the Retrocessionaires seek to establish agency bears sufficient identity to the vicarious liability theory discussed *supra* to justify its rejection for the same reasons. *See A.W. Fiur.* The Retrocessionaires have neither alleged nor brought forth any evidence, other than that relating to domination and control, on which agency may be found.

 The Retrocessionaires' last theory, that Distillers aided in the alleged fraud perpetrated by Elkhorn, likewise lacks merit. The officers and directors involved in the alleged wrongdoing were acting in their capacities as representatives of Elkhorn, and so it cannot be said that Distillers aided in the wrongdoing of Elkhorn.

*Motion to Vacate/Reconsider Judgment of Kentucky State Court*

Distillers moves to vacate a judgment of the Kentucky state court rendered in favor of the Liquidator in the amount of $20,191,-345.40. In the alternative, it seeks reconsideration of the Kentucky state court's decision.

Background

The Distillers case was originally filed in Kentucky state court on September 19, 1986. Removal was effected to the United States District Court for the Eastern District of Kentucky under 28 U.S.C. § 1441

on January 13, 1989. On June 12, 1989 the action was remanded to the state court on the basis of forum selection clauses contained in the contracts at issue. Certain defendants timely appealed the remand decision to the Sixth Circuit.

On December 27, 1989, the action having been remanded, the Kentucky state court awarded summary judgment for the Liquidator on the issue of whether Distillers would be required to repay dividends issued by Elkhorn during 1981–83. Finding that Elkhorn's insolvency in fact rendered the dividends illegal, even though no fault on the part of Elkhorn at the time of issuance was alleged for purposes of the motion, the state court ordered Distillers to pay the Liquidator $20,191,345.40. Distillers timely filed a motion to reconsider the judgment.

On March 30, 1990, subsequent to the entry of final judgment and before the state court could rule on the motion to reconsider, the Sixth Circuit reversed the Kentucky federal district court's decision to remand, thus returning the case to federal court. *In re Delta America Re Ins. Co.*, 900 F.2d 890 (6th Cir.), *cert. denied*, 498 U.S. 890, 111 S.Ct. 233, 112 L.Ed.2d 193 (1990).

Distillers now moves (1) to vacate the judgment of the Kentucky state court, on the grounds that the decision of the Sixth Circuit rendered the state court proceedings void *ab initio*, and (2) in the alternative, for reconsideration of the state court judgment pursuant to the timely filed motion.

Motion to Vacate

 It is unclear what effect a state court partial judgment rendered after remand but before a reversal of such remand should be given. The problem stems from the availability of appeal from certain remand orders, which appeals, in the words of the Fifth Circuit, have a "peculiar binary quality: Either the remand is affirmed, in which case the appeal itself was a waste

---

**11.** In fact, one of the few cases cited by the Retrocessionaires to support this theory deals not with agency but rather with "piercing the corporate veil." *Tesoro Petroleum Corp. v. Holburn Oil Co.*, 118 A.D.2d 506, 500 N.Y.S.2d 118, 120 (1st Dept.1986).

because it had no effect on the on-going state case; or the remand is reversed, in which case progress made in the state court proceedings may be nullified and the parties forced to restart in federal court." *Sykes v. Texas Air Corp.*, 834 F.2d 488, 491 (5th Cir.1987).

That opinion recognized, however, that *"final* state court judgments would not be affected by a successful appeal of a remand order." *Id.* at 491 n. 10; *see also id.* at 490. Further, "[t]here might also be intermediate rulings in the state court prior to final judgment that are final in effect and thus binding as *res judicata* even if the remainder of the case returns to federal court." *Id.* at 491 n. 10. Other courts, recognizing this possibility, have suggested that proper protection may be afforded by seeking a stay of the state court proceedings during appeal of the remand. *See Fosdick v. Dunwoody*, 420 F.2d 1140, 1141 n. 1 (1st Cir.1970); *Board of Ed. v. City-Wide Comm'n for Integration of Schools*, 342 F.2d 284, 286 (2d Cir.1965); *see also State v. Lehman*, 278 N.W.2d 610, 615 (Neb.1979) (criminal conviction on remand valid despite pending appeal of remand order); *Dorsey v. State*, 357 N.E.2d 280 (Ind. App.1976) (same). *But see Wisconsin v. Glick*, 782 F.2d 670, 672 n. 5 (7th Cir.1986) (indicating in *dicta* that state court criminal conviction could be set aside upon a subsequent decision that remand was improper).

Allowing state court final judgments to survive a successful appeal of remand will best balance the need for efficient litigation practices with the availability of a remedy to certain incorrect remand decisions, at least where, as here, the state court is competent to decide the subject matter. Nullification of intervening state court judgments would mean that a remand will cause the case to grind to a halt until appeals on the remand have been exhausted or else cause the parties and the court to go forward in what may be a futile and wasteful proceeding. On the other hand, if state court judgments are permitted to survive, the party losing the remand motion may seek the protection of a stay if it would be unduly prejudiced by being made

to proceed in state court while awaiting a disposition of its appeal.

Thus, the motion to vacate the partial summary judgment entered by the Kentucky state court should be denied, and the motion to reconsider that judgment will be considered.

Motion to Reconsider

■■■ Given that no new arguments were raised in Distillers's motion to reconsider which were not raised in the original motion for summary judgment, this Court is in the unusual position of reconsidering a decision of Kentucky state law rendered by a Kentucky state court of competent jurisdiction. Absent any compelling errors which the state court, given the chance, would itself have been likely to rectify, it would be inadvisable for the Court to decide this issue at variance with the state court. Clearly, the Kentucky state court is in a far better position to determine the meaning of state statutes and case law than a New York federal district court.

The summary judgment issue was exclusively a legal one: Whether dividends which were issued when a company was reasonably believed to be solvent must be repaid upon a showing that the company was in fact insolvent at the time of issuance. That a substantial portion of a reinsurance company's actual liabilities can only be estimated at any given time rendered the question compelling.

Finding actual insolvency to be the dispositive issue, the Kentucky state court held, and this Court does not question, that "the statutes and relevant case law suggest that when called upon to balance the interests of the shareholders of an insolvent company such as Delta against the interest of that corporation's creditors, the interest [sic] of the latter are afforded preeminent protection." *Delta America Re Ins. Co. v. Morgan*, No. 85–CI–0591–AP–6, slip op. 4 (Ky.Cir.Ct. November 29, 1989). Thus, even though the dividends may have been made and received in good faith, that the company was insolvent in fact renders them illegal under Kentucky law and subject to repayment. As Distillers cites no Kentucky authority contradicting this de-

termination, the motion to reconsider the judgment of the Kentucky state court will be denied.

### Elkhorn Cedents' Motion to Dismiss

Certain Elkhorn Cedents[12] in the American International case move to dismiss the Liquidator's complaint pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted, and for lack of subject matter jurisdiction, *inter alia.*

The dismissal of a complaint pursuant to Fed.R.Civ.P. 12(b)(6) should be granted in limited circumstances. As the Second Circuit has stated:

> [T]o dismiss a complaint for failure to state a claim upon which relief can be granted, a court must accept plaintiff's allegations at face value, ... must construe the allegations in the complaint in the plaintiff's favor, ... and must dismiss the complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Rapf v. Suffolk County of New York,* 755 F.2d 282, 290 (2d Cir.1985) (citations omitted); *see also Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Although the Liquidator provided the Cedents with copies of the alleged reinsurance treaties, the Cedents maintain that dismissal is proper. The Cedents raise several grounds for dismissal. First, the Cedents argue that the Liquidator's complaint is "so vague and ambiguous that it does not provide them with fair notice of any claim." Second, the Cedents contend that certain contract claims may be barred by the statute of limitations. Third, the Cedents challenge the Liquidator's allegations of jurisdictional amount.

### Sufficiency of Complaint

The Cedents assert that the complaint should be dismissed because the Liquidator failed to attach copies of the treaties to the complaint and neglected to plead the required elements of a contract cause of action. Neither of these arguments is tenable. First, courts in this jurisdiction have held that a plaintiff is not required to attach a copy of the contract to the complaint. *Stratton Group, Ltd. v. Sprayregen,* 458 F.Supp. 1216, 1218 (S.D.N.Y.1978); *Marquardt–Glenn Corp. v. Lumelite Corp.,* 11 F.R.D. 175, 176 (S.D.N.Y.1951). Second, the complaint sufficiently pleads the requisite elements of a contract action.

The essential elements to pleading a breach of contract under New York law are (i) the making of an agreement; (ii) due performance by the plaintiff; (iii) breach thereof by the defendant; (iv) and damage suffered by the plaintiff. *See Sprayregen,* 458 F.Supp. at 1217. "Each element need not be separately plead." *Nordic Bank, PLC v. Trend Group, Ltd.,* 619 F.Supp. 542, 561 (S.D.N.Y.1985). All that is required is " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." 2A James W. Moore, Moore's Fed.Prac. ¶ 8.13 (2d ed. 1987).

The Liquidator alleged that the Cedents entered into reinsurance treaties with Elkhorn during the underwriting years prior to 1984.[13] These allegations establish the first element of a contract claim under the liberal theory of "notice pleading" required by the Federal Rules. *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957); *see also Seligson v. Plum Tree, Inc.,* 361 F.Supp. 748 (E.D.Pa. 1973) (principle of notice pleading applies to contract actions).

---

**12.** Seven out of 37 Cedents join in this motion: Home Insurance Company ("The Home"), U.S. International Re ("Int'l Re"), St. Paul Fire & Marine Insurance Company ("St. Paul Fire"), St. Paul Surplus Lines Insurance Company ("St. Paul Surplus"), Constitution State Insurance Company ("Constitution"), Reinsurance Corporation of New York ("RECO"), and Association of Commercial Property Insurers ("ACPI"). For purposes of this motion, these seven shall be collectively referred to as the "Cedents."

**13.** For example, paragraph 26 of the complaint states that "St. Paul Fire & Marine ceded reinsurance to Delta pursuant to various treaties for the underwriting years 1984 and prior."

In addition, the Liquidator alleges due performance of the contracts. Paragraph 3 of the complaint states that "Delta was ... engaged in the business of providing reinsurance coverage. In the course of that business ... [Delta] accepted risks from insureds in exchange for payment of premiums." Allegations respecting a plaintiff's conduct are sufficient to plead contract performance. *Rosales v. AT & T Inform. Sys.*, 702 F.Supp. 1489, 1504 (D.Colo.1988). Accepting the Liquidator's allegations at face value, the assertion that Elkhorn provided reinsurance coverage to the Cedents is adequate to allege performance of the reinsurance treaties. *Rapf*, 755 F.2d at 290.

Finally, the Liquidator alleges both breach of contract and damage. Paragraphs 39–40 of the complaint state that "cedents have failed or otherwise refused to pay premiums due ... under their reinsurance treaties," and that "failure and refusal to make payment constitutes a breach of their treaty obligations." Additionally, paragraph 41 states that "the Liquidator seeks payment ... of all premiums due, ... plus interest." Thus, the complaint specifies both the nature of the breach, and the nature of the relief sought.

Because the "substantive strength and weakness of the controversy are left to the discovery process and trial ... [and only] a general indication of the type of relief sought" is required to defeat a motion to dismiss, 5 Charles A. Wright & Arthur R. Miller, Fed.Prac. & Proc.: Civil 2d § 1259 (2d ed. 1990), the complaint properly sets forth a cause of action for breach of contract; therefore, the motion to dismiss must fail.

■ The motion for a more definite statement pursuant to Fed.R.Civ.P. 12(e) also fails. In the instant case, amendment of the complaint would be fruitless, as the Cedents have already been supplied with copies of the alleged contracts. Moreover, the Cedents' claim that the produced documents are incomplete is irrelevant. "[D]iscovery is not the purpose behind Rule 12(e)." *Marquardt–Glenn Corp. v. Lumelite Corp.*, 11 F.R.D. 175 (S.D.N.Y.

1951). A rule 12(e) motion should be granted only when a "pleading is so vague and ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed.R.Civ.P. 12(e). The Cedents have provided affidavits acknowledging the existence of a number of contracts with Delta Re. Thus, the Cedents cannot claim that they are unable to respond to the Liquidator's complaint.

Statute of Limitations

■ The Cedents next contend that certain contract claims are barred by the statute of limitations. In New York, breach of contract claims must be brought within six years from the time of breach. N.Y.C.P.L.R. § 213(2); *Barr v. McGraw–Hill, Inc.*, 710 F.Supp. 95, 98 (S.D.N.Y. 1989). As such, any claim alleging a breach prior to September 1984 would be barred by the statute of limitations.

*Subject Matter Jurisdiction*

■ The Cedents next contend that the Liquidator's allegations of jurisdictional amount are deficient. It is well established that the Liquidator has the burden of showing that the Court has jurisdiction by a preponderance of the evidence. *McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Moreover, in order to challenge this Court's subject matter jurisdiction the Cedents need make no formal motion. 5A Wright & Miller, *supra*, § 1393; Fed. R.Civ.P. 12(h)(3) (lack of subject matter jurisdiction can be raised by informal "suggestion" or by the suggestion of the court). Thus, the Cedents' contention that the Liquidator's assertions of jurisdictional amount are unsupportable is sufficient to require the Liquidator to support the jurisdictional allegations with competent proof. *See McNutt*, 298 U.S. at 189, 56 S.Ct. at 785 (party alleging jurisdiction must justify allegation by preponderance of the evidence).

Here, the Cedents provided affidavits stating that the claims against St. Paul Fire, RECO, and St. Paul Surplus did not exceed $50,000, and that the value of the

claims against The Home and Constitution State could not be calculated from the supplied contracts.[14] The Liquidator subsequently dismissed St. Paul Fire pursuant to Fed.R.Civ.P. 41(a), and conceded that the claim against RECO should actually have named RECO's London-based subsidiary New York Reinsurance Corporation. *See* Plaintiff's Sur–Reply Memorandum, p. 3. The Liquidator stated that he would amend the complaint pursuant to Fed.R.Civ.P. 15(c) to correctly identify the proper party. Sur–Reply Brief at 3. As of this date, however, he has failed to do so. Thus, the claim against RECO is dismissed.

■■■ The Liquidator has produced an affidavit stating that the claim against St. Paul Surplus exceeded $50,000. Supplemental Aff. of James E. Dickinson dated March 24, 1992. Thus, the plaintiff has met its burden, and the question of whether the claim against St. Paul Surplus exceeds the jurisdictional amount is a question of fact; therefore, the Court will not dismiss for lack of subject matter jurisdiction. *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938) (unless clear to "legal certainty" that jurisdictional amount cannot be met, complaint should not be dismissed for lack of subject matter jurisdiction); *AFA Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir.1991) (same); *Moore v. Betit*, 511 F.2d 1004, 1006 (2d Cir.1975) (same).

The Liquidator, however, has failed to address the Court's jurisdiction over the claims against The Home, Constitution State, U.S. Int'l Re, and ACPI. Once subject matter has been called into question, the Liquidator carries the burden of proving that the Court has jurisdiction over these actions. The Liquidator, through a failure to provide any information regarding the amounts at issue with respect to these four Cedents, has not carried this burden. Therefore, these four Cedents will be dismissed.

### Motion to Dismiss Cross–Claims against Kentucky State Officials

Third party defendants in the ARM case William W. Barton, Jr. ("Barton"), Daniel D. Briscoe ("Briscoe"), James E. Dickinson ("Dickinson"), and Gil McCarty ("McCarty") (collectively, "Third Party Defendants") move to dismiss the claims against them under Fed.R.Civ.P. 12(b)(6). Third party plaintiffs in the American Home case move for reconsideration of an order dismissing the identical claims.

Background

In these cases the Liquidator has brought claims against certain individuals ("Third Party Plaintiffs") who managed and controlled the operations of Delta Re from October, 1983 to May, 1985, when it was placed in rehabilitation proceedings. Third Party Plaintiffs have filed a third party complaint against Kentucky Department of Insurance officials Barton, Briscoe, Dickinson, McCarty, and Silvia Canonico,[15] claiming that their failure to perform their duties properly entitles Third Party Plaintiffs to contribution.

Briscoe was the Commissioner of Insurance for the Commonwealth of Kentucky from January 30, 1980 until December 13, 1983; he was succeeded by McCarty, who held the post until February, 1988. Dickinson was a field examiner for the department and in October, 1980 became the director of the financial division. Barton was the principal examiner for the department.

Third Party Plaintiffs claim that a quadrennial department investigation of Elkhorn conducted by Dickinson in October, 1979 revealed that Elkhorn had a deficiency in loss reserves.[16] Based on this knowledge, Third Party Plaintiffs allege that Third Party Defendants had duties to pre-

---

**14.** The Cedents provided no affidavits regarding the claims against U.S. Int'l Re or ACPI.

**15.** Sylvia Canonico does not appear to be a party to this motion. However, she was dismissed along with the four Third Party Defendants in the American Home case, *see infra.*

**16.** For an explanation of loss reserves see discussion of the Elkhorn Retrocessionaires' summary judgment motion, *supra.*

vent the filing by Elkhorn of incorrect financial statements, to refuse to approve the sale of Elkhorn/Delta Re to Delta Holdings or the bulk reinsurance agreement involved therein, and to revoke or suspend Elkhorn/Delta Re's certificate of insurance. Third Party Plaintiffs also claim that Third Party Defendants failed to conduct a statutorily mandated quadrennial review.

These same claims were made in two cases: the ARM case and the American Home case. At the same time that he transferred the American Home case to this district, Judge Bertelsman of the Eastern District of Kentucky granted Third Party Defendants' motion to dismiss these claims in that case.

Third Party Defendants move to dismiss the claims in the ARM case for failure to state a claim, contending (1) that the Eleventh Amendment prevents suit in federal court against state officials based on state law; (2) that they are entitled to immunity for these actions; and (3) that Third Party Plaintiffs failed to allege an actionable duty owed. Third Party Plaintiffs oppose the motion and move for reconsideration of Judge Bertelsman's dismissal of the claims in the American Home case.

Discussion

### Eleventh Amendment

■ Third Party Defendants argue that the claims against them are barred by the Eleventh Amendment as they are state officials. However, the claims have been filed against the Third Party Defendants in their personal capacities, as opposed to their official capacities. Such suits have been construed to be within federal jurisdiction since 1908, when the Supreme Court decided *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441. *Hafer v. Melo*, — U.S. —, —, 112 S.Ct. 358, 364, 116 L.Ed.2d 301 (1991); *Scheuer v. Rhodes*, 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974).

Third Party Defendants claim that this analysis is inapplicable when the suit is against a state official and grounded strictly on state law. They quote *Pennhurst*

*State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984):

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

465 U.S. at 106, 104 S.Ct. at 911. However, Third Party Defendants quote *Pennhurst* out of context. *Pennhurst* addressed the issue of when an *injunction* compelling a state official to act was within the jurisdiction of the federal courts. The Court found that although prospective injunctions preventing violation of federal law were not barred by the Eleventh Amendment, *see Ex parte Young*, similar injunctions seeking compliance with *state law* were barred. However, a prerequisite to the holding in *Pennhurst* was that the state was the real, substantial party in interest, a situation defined generally as when the judgment sought would obligate the state to pay monies or be compelled to act or restrained from acting. 465 U.S. at 101–02 n. 11, 104 S.Ct. at 908 n. 11, citing *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). "[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact *directly on the State itself*." 465 U.S. at 117, 104 S.Ct. at 917 (emphasis added). Whereas an injunction against a state official affecting the performance of his or her duties clearly acts directly against the state, an action against the official personally for damages for past actions does not, and thus is not barred by the Eleventh Amendment.

The Supreme Court has affirmed this view. After reviewing *Pennhurst*, the Court said, "When a state official is sued and held liable in his *individual* capacity, however, even damages may be awarded." *Papasan v. Allain*, 478 U.S. 265, 278 n. 11,

106 S.Ct. 2932, 2940 n. 11, 92 L.Ed.2d 209 (1986), citing *Scheuer v. Rhodes.* "*Pennhurst* and the Eleventh Amendment do not deprive federal courts of jurisdiction over state law claims against state officials strictly in their individual capacities." *Wilson v. UT Health Center,* 973 F.2d 1263, 1271 (5th Cir.1992); *see also Pena v. Gardner,* 976 F.2d 469, 472–73 (9th Cir.1992) (same); *Gierlinger v. New York State Police,* 1992 WL 106279, *2 (W.D.N.Y.) (same); *Derechin v. State Univ. of New York,* 731 F.Supp. 1160, 1164 (W.D.N.Y. 1989) (state law claims viable against state official in individual capacity); *Sanders v. Coughlin,* 1987 WL 26872, *2 (S.D.N.Y.) (acknowledging viability of state law claims against state officials in personal capacity). Thus, whether claims against a state official in his or her personal capacity are made on the basis of federal or state law is irrelevant for Eleventh Amendment purposes; it bars neither.

### Governmental Immunity/Duty of Care

Since jurisdiction is not restricted by the Eleventh Amendment, the Third Party Defendants' challenge to the allegations of liability in the complaint deserves consideration. Whether Third Party Defendants have committed a tortious act is to be determined with reference to the laws of Kentucky.

 In Kentucky, tort liability does not arise from a failure to perform legislative, judicial, quasi-legislative, or quasi-judicial functions properly. *Haney v. City of Lexington,* 386 S.W.2d 738, 742 (Ky.1964). Thus, "there are certain governmental activities which by their nature do not classify as tortious conduct even though a court might judge they were performed improperly." *Bolden v. City of Covington,* 803 S.W.2d 577, 580 (Ky.1991). Such activities include "cases where the 'government takes upon itself a regulatory function,' which is different from any performed by private persons or in private industry, and where, if it were held liable for failing to perform that function, it would be a new kind of tort liability." *Gas Service Co. v.*

*City of London,* 687 S.W.2d 144, 149 (Ky. 1985) (citation omitted).

The *Gas Service* opinion provided two previous cases as examples. In *Department of Banking & Sec. v. Brown,* 605 S.W.2d 497 (Ky.1980), the plaintiffs alleged malfeasance of a regulatory agency charged with inspection and regulation of two building and loan associations when they defaulted on their obligations to depositors. In *Grogan v. Commonwealth,* 577 S.W.2d 4 (Ky.), *cert. denied,* 444 U.S. 835, 100 S.Ct. 69, 62 L.Ed.2d 46 (1979), the plaintiffs attempted to base liability on a failure to enforce properly laws imposing safety standards for building construction and use. Both of these cases, it was held in *Gas Service,* presented prime examples of cases involving "the type of regulatory activity" where "the government was not charged with having caused the injury, but only with having failed to prevent it by proper exercise of regulatory functions which have elements appearing quasi-judicial and quasi-legislative in nature." 687 S.W.2d at 149.

*Gas Service* was followed by *Bolden,* in which plaintiffs asserted liability based on the "failure of the Director of Housing Development and city inspectors to enforce certain provisions of the City's Housing Code applying to fire safety violations." 803 S.W.2d at 578. Finding such functions "regulatory and quasi-judicial in nature," *id.* at 581, the Kentucky Supreme Court refused to impose liability on the basis of the *Haney* and *Gas Service* doctrine. *See Cabinet for Human Resources v. Poore,* 711 S.W.2d 498, 500 (Ky.Ct.App.1986) (failure properly to release and supervise two juveniles did not give rise to liability under *Haney* and *Gas Service* ); *see also Moore v. Commonwealth,* —— S.W.2d —— 1992 WL 214262 (Ky.Ct.App. June 26, 1992) (no liability attributed to Corrections Cabinet for conduct of parolee) (opinion not yet final).

 Although all of the above opinions focus on municipal liability, the analysis is no different where, as here, personal liability is at issue. The doctrine set forth in *Haney* and affirmed in later opinions is not one of immunity, but rather a declaration

that no tort liability exists in the first place from which one could be immunized. *See Bolden,* 803 S.W.2d at 580 (activities "do not qualify as tortious conduct"); *Gas Service,* 687 S.W.2d at 149 (such an action would require a "new kind of tort liability"). *Cf.* Restatement (Second) of Torts § 895C, Comment h (1992) ("the real reason for holding no liability is that no tort was committed").

Moreover, the policy for refusing to impose liability on individuals "is the same as that which frees the state or the local government from liability." *Id.* at § 895D (Immunities—Public Officers), Comment c; *see also id.* at § 895D(2). Indeed, the justification for freeing officials from liability for such functions may be even greater than that for freeing governmental entities: "With respect to some government functions, the threat of individual liability would have a devastating effect, while the threat of governmental liability would not significantly impair performance." *Id.* at § 895D, Comment j. *See Bolden,* 803 S.W.2d at 580 (quoting Restatement comments to §§ 895B, 895C); *Thompson v. Huecker,* 559 S.W.2d 488, 496 (Ky.Ct.App. 1977) (adopting § 895D as Kentucky law); *Blue v. Pursell,* 793 S.W.2d 823, 825 (Ky. Ct.App.1989), *discretionary rev. denied by Supreme Court* (1990) (affirming adoption of Restatement approach).

A recent opinion of the Kentucky Supreme Court, which is not yet final, recognizes such identity of analysis without even questioning it. *Ashby v. City of Louisville,* 841 S.W.2d 184 (Ky. November 20, 1992) (opinion not yet final). Thus, if the duties which Third Party Defendants are alleged to have performed improperly are quasi-legislative or quasi-judicial in nature, tort liability cannot be based upon them.

It is clear that the duties in question are "regulatory and quasi-judicial in nature." Third Party Defendants were charged with regulation of the insurance industry in Kentucky, a function clearly different from that "performed by private persons or in private industry," and holding them liable for failure to perform these duties properly would no doubt be an imposition of a "new kind of tort liability." The duties involved in this case are closely analogous to those

in *Brown,* upon which the *Gas Service* court explicitly said liability could not be based. For these reasons, the claims asserted against Third Party Defendants cannot stand.

### Reconsideration of American Home Dismissal

Third Party Plaintiffs ask for reconsideration of a judgment dismissing these claims in the American Home case entered on April 9, 1991 in the Eastern District of Kentucky. They contend that the claims were erroneously dismissed in the American Home case, and should be reinstated.

While ordinarily this Court would be extremely hesitant even to examine a decision previously rendered by another district court prior to transfer, the situation here demands reconsideration and a denial of Third Party Plaintiffs' motion. Judge Bertelsman dismissed the claims solely on the basis of official immunity under Sixth Circuit law as set forth in *Cowan v. University of Louisville Sch. of Med.,* 900 F.2d 936 (6th Cir.1990). *Morgan v. American Home Assur. Co.,* 89–Civ–55 slip op. at 1–2 (E.D.Ky. April 9, 1991). Although Third Party Plaintiffs argue that *Cowan* applies only to immunity from § 1983 suits, and thus was incorrectly applied, that issue need not be reached. *Cowan* was recently overruled by the Supreme Court in *Hafer v. Melo,* — U.S. —, —, 112 S.Ct. 358, 363, 116 L.Ed.2d 301 (1991), and thus cannot be a proper basis to prevent Third Party Plaintiffs from making their claims. In the interests of justice, the dismissal of Third Party Plaintiffs' claims in American Home should be reviewed.

Third Party Defendants argue that regardless of the legal basis for Judge Bertelsman's dismissal, that dismissal was a condition of the transfer order and so cannot be reconsidered. However, there is no indication that Judge Bertelsman intended to condition transfer of the American Home case on dismissal of the Third Party Defendants. While it is true that he considered the Third Party Defendants' objections "the main obstacle" to transfer, *see* Transcript of Hearing Before Hon. William O. Bertelsman, April 4, 1991 at 7, his dismissal of claims against Third Party Defen-

dants reflected no such basis, but rather was grounded on now invalid law. The dismissal of the claims on immunity grounds merely simplified the decision to transfer. There is no indication that transfer would not have been made if the motion to dismiss had been denied and Third Party Defendants had remained in the case.[17]

Upon reconsideration, these claims should be dismissed for the reasons stated above, *see* pp. 962–63.

*Conclusion*

For the foregoing reasons, the motions in these four cases will be disposed of as follows:

1. *Stephens v. National Distillers & Chem. Corp.*, 91–Civ–2901

Plaintiff's motion to certify is DENIED.

Plaintiff's motion for judgment on the pleadings/summary judgment is DENIED.

Defendants' motion for summary judgment is DENIED.

Cross-claim defendant Quantum Chemical Corporation's motion for summary judgment is GRANTED. The cross-claims asserted against defendant Quantum Chemical Corporation by other defendants are DISMISSED WITH PREJUDICE.

Defendant's motion to vacate and/or reconsider the partial judgment of the Kentucky state court is DENIED.

2. *Stephens v. American Risk Management*, 89–Civ–2999

Plaintiff's motion to certify is DENIED.

Plaintiff's motion for judgment on the pleadings/summary judgment is DENIED.

The motion of third-party defendants Barton, Briscoe, Dickinson and McCarty to dismiss the claims against them is GRANTED. These claims are hereby DISMISSED WITH PREJUDICE.

3. *Stephens v. American Home Assurance Co.*, 91–Civ–2898

Plaintiff's motion to certify is DENIED.

Plaintiff's motion for judgment on the pleadings/summary judgment is DENIED.

Third-party plaintiffs' motion to reconsider is DENIED.

4. *Stephens v. American International*, 91–Civ–6245

Defendants' motion to dismiss the claims against defendant Home Insurance Company, defendant U.S. International Re, defendant Constitution State Insurance Company, defendant Reinsurance Corporation of New York, and defendant Association of Commercial Property Insurers is GRANTED. The claims against these parties are hereby DISMISSED WITHOUT PREJUDICE, except that the claims against defendant Reinsurance Corporation of New York are DISMISSED WITH PREJUDICE. Defendants' motion to dismiss the claims against defendant St. Paul Surplus Lines Insurance Company is DENIED.

SO ORDERED.

---

**17.** Third Party Defendants claim that considerations of both convenience and personal jurisdiction would have prevented Judge Bertelsman from ordering transfer. Since Third Party Defendants are already parties to the similar ARM case, *see supra,* it seems unlikely that being parties to American Home would be as onerous as they claim. No opinion is expressed as to whether personal jurisdiction exists over them in the American Home case.