UBS SECURITIES, INC., Plaintiff,

v.

Harry G. TSOUKANELIS and HT
Investing Co., Defendants.

No. 93 Civ. 1049 (MEL).

United States District Court,
S.D. New York.

May 19, 1994.

Grais & Phillips, New York City, for plaintiff; David J. Grais, of counsel.

Mishkin, Kohler & Imholz, New York City, for defendants; William R. Kohler, Linda L. Barnes, of counsel.

LASKER, District Judge.

This action arises from the 1989 acquisition of the fruit juice business of a company called Moser Farms Dairy, Inc. by Natural Country Farms, Inc. The moving force behind the acquisition was Harry Tsoukanelis, the individual defendant.

Tsoukanelis approached UBS Securities in 1989 for advice and assistance in raising the requisite capital to acquire Moser Farms Dairy's business. UBS had some difficulty finding interested investors and ultimately, to bring the transaction to a close, decided to participate in the investment by purchasing 25 shares of Natural Country Farms, Inc. for $100,000. The conditions of UBS's equity participation were set forth in a letter agreement dated November 27, 1989 between UBS and the other investors in Natural Country Farms, Inc., which specified the circumstances in which UBS would have the right to resell, or "put," its 25 shares to the other investors (the "Put Agreement").

Sometime after the acquisition, it became apparent that the investment had not been profitable and UBS sought to resell its 25 shares to the defendants. When the defendants refused, UBS filed suit. The complaint requests "an order requiring defendants to purchase the 25 shares from plaintiff for $10,976 per share" or "[d]amages of $274,-400." A bench trial has been held.

The parties agree that New York law controls.

## I.

To understand the Put Agreement, some background about the structure of the acquisition is required. Natural Country Farms, Inc., the acquisition vehicle, is majority controlled by Kane's Partners Limited, a Delaware general partnership, and that entity, in turn, is owned by HT Investing Co. (83.23%), Mr. S. Lawrence Feit (11.61%) and MJ Enterprise, Inc. (5.16%). Harry Tsoukanelis is the sole shareholder and director of HT Investing Co., a Delaware corporation.

The named parties to the Put Agreement are UBS, Natural Country Farms, Inc., and the three partners of Kane's Partners Limited. The agreement divides the rights and obligations of the partners in the event of a put by UBS in accordance with their share in the partnership. It provides that:

1. (a) UBS shall have the irrevocable right and option (the "Put") to cause the purchase of all or any portion of its 25 shares of NCF common stock (the "First

Put Shares") ... to HT, LF and MJ.... UBS shall be paid an amount ... equal to $10,976 per share of NCF (the "Put Price") being sold pursuant to the Put. If UBS elects to exercise its Put, HT, LF and MJ shall have the option to purchase a portion of the First Put Shares being sold by UBS in the proportion that the net income/loss allocation of HT, LF and MJ, as defined in the Partnership Agreement between HT Investing Co., LF and MJ, exercising its option bears to each other (sic).... If all the First Put Shares being sold by UBS are not purchased by HT, LF and MJ pursuant to the option described above, HT will have the obligation to purchase the portion of First Put Shares not purchased by LF and/or MJ.

The questions to be resolved are i) whether the Put Agreement requires HT Investing Co. to purchase all of the 25 shares UBS seeks to resell and, if so, ii) whether Harry Tsoukanelis is personally liable.

## II.

■ The defendants maintain that HT Investing Co.'s obligation under the Put Agreement is limited to purchasing those shares which the other partners could have, but failed to purchase from UBS. Since the Put Agreement limits the purchase rights of the other partners in accordance with their percentage ownership of Kane's Partners Limited—totaling 16.77%—the defendants contend that HT Investing Co.'s obligation under the Put Agreement is limited to purchasing 16.-77% of the 25 shares UBS seeks to sell. The defendants rely on the sentence of paragraph 1(a) which provides that "[i]f all the First Put Shares being sold by UBS are not purchased by HT, LF and MJ ... HT will have the obligation to purchase the portion of First Put Shares not purchased by LF and/or MJ."

UBS, on the other hand, maintains that the Put Agreement requires the defendants to purchase 100% of the shares that it seeks to sell. UBS argues that the defendants' position is inconsistent with the first sentence of paragraph 1(a) of the Put Agreement which provides that "UBS shall have the irrevocable right and option (the "Put") to cause the purchase of all or any portion of its 25 shares of NCF common stock (the "First Put Shares") ... to HT, LF and MJ." UBS points out that, if the defendants' reading of the agreement were correct, HT Investing Co.'s obligations would paradoxically vary inversely with its percentage ownership of Kane's Partners Limited. That is, for example, if HT Investing Co. were to buy out the other partners, so that it owned 100% of Kane's Partners Limited, HT Investing would, according to the defendants, have no obligation to purchase *any* of UBS's shares.

I conclude that the Put Agreement cannot reasonably be read to mean what the defendants suggest. Paragraph 1(a) plainly states that *"UBS* shall have the irrevocable *right* and *option* ... to cause the purchase of *all* or any portion of its 25 shares of NCF common stock" (emphasis added) and also that "HT will have the obligation to purchase the portion of First Put Shares not purchased by LF and/or MJ."

Moreover, even if the text of the Put Agreement could reasonably be read to mean what the defendants suggest, the acts and circumstances surrounding the execution of the Put Agreement favor UBS's interpretation. For example, on November 22, 1989, a mere five days before the Put Agreement was signed, Harry Tsoukanelis personally signed an amended engagement letter with UBS which provides that:

> UBS shall receive the irrevocable right and option (the "Put") to re-sell all or any portion of its Investment. The terms of the Put will be more fully described in the agreement by and among UBS, MJ Enterprise Inc. and HT Investing Co. attached hereto as Exhibit A.

James K. Phelps, formerly employed by UBS Securities as a managing director and in charge of its work on this transaction, testified persuasively that the Put Agreement, signed shortly thereafter, embodied the parties' intentions of November 22.

In sum, the Put Agreement requires HT Investing Co. to purchase the 25 shares UBS seeks to resell.

### III.

UBS maintains that Tsoukanelis is personally liable under the Put Agreement because i) Tsoukanelis was a party to the agreement, ii) Tsoukanelis acted as an agent for a partially disclosed principal and iii) the corporate veil should be pierced in this case.

*Liability as a party to the Put Agreement*

■ The named parties to the Put Agreement are UBS, Natural Country Farms, Inc. and the partners of Kane's Partners Limited—Ht Investing Co., S. Lawrence Feit and MJ Enterprise, Inc. Tsoukanelis signed the agreement as Chief Executive Officer of Natural Country Farms, Inc. and as President of HT Investing Co. He did not sign the agreement in a personal capacity. The only indication on the face of the agreement that the parties intended Tsoukanelis personally to be a party to the agreement is that he is listed as an addressee above the text of the Put Agreement.

The testimony at trial regarding the intentions of the parties added nothing decisive to the mix. Phelps, testified that he understood Tsoukanelis to be personally bound by the Put Agreement, (T. 47), but Tsoukanelis testified that he had told UBS repeatedly that he would not "guarantee anything personally," (T. 150).

That Tsoukanelis is personally addressed in the Put Agreement is not sufficient evidence to establish that the parties intended him to be personally bound.

*Agent liability*

■ UBS's agency theory of liability is not alleged in the complaint. However, UBS moved prior to trial to amend the complaint to conform to the evidence pursuant to Fed. R.Civ.P. 15(b). Ruling on the motion was deferred to determine whether the defendants would be prejudiced by the proposed 11th hour amendment. The trial established that the new theory would not require further discovery because it involved essentially the same facts as those relevant to UBS's original claims. Since Rule 15(b) provides that the Court shall permit amendment freely where there has been no showing of prejudice by the defendants, the motion is granted.

■ UBS contends that Tsoukanelis is liable as the agent of a partially disclosed principal because Tsoukanelis failed to disclose to UBS that HT Investing Co., on whose behalf he signed the Put Agreement, was a Delaware corporation. UBS argues that it had no reason to believe that HT Investing Co. was a corporation, as opposed to being a trade name under which Tsoukanelis personally conducted business, and points out that, under New York law, the suffix "Co." is not sufficient to indicate corporate status. N.Y. Business Corp. Law § 301(a)(1) (McKinney 1986).

Tsoukanelis makes no claim that he ever informed UBS that HT Investing Co. was a corporation, although he did testify, as indicated above, that he had told UBS repeatedly that he would not "guarantee anything personally."

■ Under New York law, an agent who fails to disclose at the time the parties enter a contract that he is acting on behalf of a corporate principal becomes personally liable under the contract. *New England Marine Contractors, Inc. v. Martin,* 156 A.D.2d 804, 805, 549 N.Y.S.2d 535, 536 (3d Dep't 1989). The most that can be said for the general disclaimer of personal liability which Tsoukanelis states he made to UBS, is that UBS may, as a result, have had reason to suspect that Tsoukanelis was acting on behalf of a corporate entity. However, nothing short of clear disclosure of the principal's corporate status will relieve an agent from personal liability. *Tarolli Lumber Co. v. Andreassi,* 59 A.D.2d 1011, 1012, 399 N.Y.S.2d 739, 740 (4th Dep't 1977). "The mere fact that the plaintiff had reason to suppose that [the defendant was] acting as an agent" is not enough. *Id.* "There is no requirement that the plaintiff, as a third party, make an 'investigation,' to obtain actual knowledge whether the defendant[ ] with whom it was dealing [was], in fact, [an] agent[ ] for an undisclosed corporate principal." *Id.* The purpose of this rule is, of course, to make sure that a party entering a contract knows precisely with whom it is dealing and protects a party from unknowingly being required to do business with an entity incapable of meeting its

contractual obligations. Accordingly, Tsoukanelis is liable for the obligations of HT Investing Co. under the Put Agreement as an agent acting for a partially disclosed principal.

*Alter ego liability*

■ Under New York choice of law principles, "[t]he appropriate law to apply to the question of whether to pierce the corporate veil is the law of the state of incorporation." *Stephens v. American Home Assurance Co.,* 811 F.Supp. 937, 951 (S.D.N.Y. 1993). "[T]he state of incorporation has the greater interest in determining when and if that insulation is to be stripped away." *Soviet Pan Am Travel Effort v. Travel Comm.,* 756 F.Supp. 126, 131 (S.D.N.Y.1991). Since HT Investing Co. was incorporated in Delaware, its law controls on this issue.

■ Under Delaware law, "a court can pierce the corporate veil of an entity where there is fraud or where [it] is in fact a mere instrumentality or alter ego of its owner." *Geyer v. Ingersoll Publications Co.,* 621 A.2d 784 (Del.Ch.1992). "The question of whether [a corporation is its owner's] alter ego or mere instrumentality may be restated to be whether [they] operated as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them." *Mabon, Nugent & Co. v. Texas American Energy Corp.,* 1990 WL 44267, at *4 (Del.Ch. Apr. 12, 1990).

■ UBS introduced substantial evidence which established that Tsoukanelis and HT Investing Co. operated as a "single economic entity." To begin with, Tsoukanelis conceded at trial that there was a general absence of the formalities and paraphernalia that are part and parcel of corporate existence. For example, Tsoukanelis testified that HT Investing Co. had no employees, offices or bank account, kept no financial statements, never filed a tax return and never held any meetings of any sort after it was incorporated. In fact, HT Investing Co. never did anything at all apart from participating in the ownership of Natural Country Farms, Inc. via its 83.23% control of Kane's Partners Limited. Finally, Tsoukanelis conceded that HT Investing Co. was actually dissolved by the State of Delaware on March 1, 1991 for failure to pay its franchise taxes and was not reinstated by Tsoukanelis until over two years later.

More damning still, the evidence at trial showed that there was little, if any, distinction in Tsoukanelis's own mind between the business of HT Investing Co. and his own. Tsoukanelis testified that he considered HT Investing Co. to be a "passive" entity and stated in a deposition in a related case that the distinction between himself as an individual and HT Investing Co. "as you know, over the years ... phase[d] in and out." (Tsoukanelis Dep. of Feb. 19, 1993 at 477–78). Documentary evidence showed that Tsoukanelis thought of himself as a partner of Kane's Partners Limited, even though, in fact, HT Investing Co. was the partner. For example, Tsoukanelis signed two tax returns and a Pledge Agreement dated November 28, 1989 personally as a partner of Kane's Partners Limited. Moreover, Tsoukanelis personally paid HT Investing Co.'s expenses, including its Delaware filing fees and legal costs.

For these reasons I conclude that Tsoukanelis and HT Investing Co. operated as a single economic entity and that, accordingly, Tsoukanelis is personally liable for the corporations's obligations under the Put Agreement.

### IV.

UBS has applied for $960.00 in attorney fees and $25.00 in miscellaneous disbursements in connection with its motion to compel the production of "any personal checks of defendant Tsoukanelis by which he paid any expense of defendant HT Investing Co."

I find that the motion was made necessary because of the defendants' inordinate delay in responding to UBS's discovery request. Accordingly, the defendants should bear UBS's reasonable costs in making the motion. However, the nature and subject matter of the motion—compelling the defendants to produce Tsoukanelis's personal checks—was relatively straightforward and fails to justify the amount requested by UBS. Accordingly, UBS' application is granted to the

extent of $500 attorney fees and $25 disbursements and is otherwise denied.

## CONCLUSION

The Put Agreement requires HT Investing Co. to purchase the 25 shares UBS seeks to resell and Harry Tsoukanelis is personally liable for HT Investing Co.'s obligations under the Put Agreement. UBS is granted $500 in attorney fees and $25 in disbursements in connection with its discovery motion.

Submit proposed judgment on notice.