Robert CRAIG as Co–Liquidator of Alpine Assurance Company, Ltd. and Amarilis Black, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

THE BANK OF NEW YORK, Defendant.

No. 00 CIV 8154 SAS.

United States District Court, S.D. New York.

April 27, 2001.

Robert L. Brace, Hollister & Brace, P.C., Santa Barbara, CA, Thomas F. McDermott, Garden City, NY, for Plaintiffs.

Leo T. Crowley, Daniel Z. Mollin, Pillsbury Winthrop LLP, New York City, Dan J. Schulman, The Bank of New York City, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Robert Craig as Co–Liquidator of Alpine Assurance Company, Ltd. ("Alpine") and Amarilis Black, on behalf of themselves and all others similarly situated, filed this putative class action against The Bank of New York ("BNY"), alleging that BNY breached the provisions of a Trust Agreement (the "Agreement") between Alpine and BNY.[1] Plaintiffs also allege that BNY, as trustee, breached its fiduciary obligations owed to the beneficiaries of the trust.[2] Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.[3]

BNY now moves for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure. For the following reasons, BNY's motion is granted.

## I. BACKGROUND [4]

### A. The National Association of Insurance Commissioners ("NAIC")

By statute, the insurance commissioners of each state are empowered to protect the interest of the insurance purchasing public in their jurisdiction. *See* Declaration of John E. Darwood ("Darwood Decl."), For-

---

1. On December 20, 1991, Alpine entered into a second trust agreement (the "Texas Agreement") with Ameritrust of Texas, N.A. ("Ameritrust"). *See* BNY's Statement Pursuant to Local Rule 56.1(a) ("Def.56.1") ¶ 24. The Texas Agreement is the subject of a separate action pending in the United States District Court for the Northern District of Texas. *See id.* The Texas action was filed by the same plaintiffs involved in this case. *See id.*

2. In addition to money damages, plaintiffs seek an accounting, reformation of the Agreement to "comport with the intent of the document," and the appointment of Craig as trustee *ad litem. See* Complaint ("Compl.") ¶¶ 44–47.

3. Craig, a citizen of Nebraska, has been appointed by the Supreme Court of the Turks and Caicos Islands as Joint Official Liquidator of Alpine, and granted the authority to bring any action, suit, prosecution or other legal proceeding in the name of and on behalf of Alpine. *See* Def. 56.1 ¶ 4. Black is a citizen of California who holds an unsatisfied judgment against Alpine in an amount exceeding $75,000, stemming from a car accident that occurred on February 16, 1993. *See id.* ¶ 5; Affidavit of Amarilis Black ¶¶ 5, 6. BNY is a federally insured financial institution with its principal offices in New York. *See* Def. 56.1 ¶ 3.

4. All facts discussed are viewed in a light most favorable to plaintiffs, the non-moving party. *See Schonfeld v. Hilliard,* 218 F.3d 164, 172 (2d Cir.2000). However, only those facts that have been properly set forth in accordance with Federal Rule of Civil Procedure 56(e) and Local Rule 56.1 will be considered for purposes of this motion. *See Morris v. Northrop Grumman Corp.,* 37 F.Supp.2d 556, 569 (E.D.N.Y.1999).

mer Manager of the Non–Admitted Insurers Information Office ("NAIIO"), ¶ 7.[5] However, because the insurance business tends to be a multistate endeavor, this is often difficult to do. *See id.* The NAIC was established, in part, to enable the states to regulate multistate insurance transactions more effectively. *See id.* The NAIC is an association whose membership is comprised of the insurance commissioners from each state. *See id.* As part of its mandate, the NAIC "collects information about insurance companies, processes this information into a usable form for the insurance regulatory community, and acts as an information clearing house for state insurance investigators." Def. 56.1 ¶ 9.

## B. The NAIC Standard Trust Agreement

Most states require that to sell their insurance products off-shore insurance companies must maintain trust accounts in federally insured and regulated banks. *See id.* ¶ 10. This requirement was intended to guarantee that funds would be available to pay any claims against the company should it falter financially. In response to this requirement, the NAIC drafted a standard trust agreement designed to facilitate the establishment of such trusts. *See id.*

## C. The Alpine Fraud

Alpine was an off-shore insurance company incorporated and domiciled in the Turks and Caicos Islands of the British West Indies. *See id.* ¶ 3. From 1991 through 1997, Alpine engaged in the solicitation, issuance and delivery of insurance contracts to United States residents. *See id.* Alpine's policies were sold through surplus lines brokers licensed by various state insurance departments. *See id.* During this time, however, Alpine was managed by a small group of insurance con artists who engaged in significant fraudulent activities. *See id.* ¶ 7. Such activity included using premiums for personal benefit and looting Alpine of its assets, thereby destroying Alpine's ability to pay claims and eventually rendering Alpine insolvent. *See id.* The Alpine management accomplished this fraud, in part, by providing their purported trusts with inadequate funding and with assets whose values could not be ascertained for insurance regulatory purposes. *See id.* ¶ 8.

## 1. The Agreement

On August 15, 1991, BNY entered into a standard trust agreement with Alpine.[6] *See id.* ¶ 14. Under the terms of this Agreement, BNY was to serve as trustee. *See id.* Pursuant to paragraphs 1.5 and 2.8 of the Agreement, Alpine was required to fund the trust with no less than $5.4 million, which could consist of any combination of cash, readily marketable securities, or letters of credit. On August 30, 1991, Alpine deposited with and instructed BNY to hold in trust 3,200,000 shares of Monoclonal Medical, Inc. ("Monoclonal") stock. *See* Account Statement, Ex. A to Affidavit of Jack Fruchtman ("Fruchtman Aff."), Vice President and Manager of the Insurance Trust and Escrow Unit in the Corporate Trust Division of The Bank of New York. On September 10, 1991, 500,000 shares of Creative Classics International ("Creative Classics") stock were deposited

---

5. The NAIIO, now the International Insurers Department, was a division of the NAIC that acted as a clearing house for information on the U.S. activity of off-shore insurers. *See* Darwood Decl. ¶ 2.

6. Because BNY agreed to administer the trust from its offices in New York the Agreement is governed by New York law. *See* Paragraph 5.1 of the Agreement, Ex. 2 to Darwood Decl.

in the same account.[7] *See id.* BNY then asked the law firm of Emmett, Marvin & Martin ("EMM") to confirm whether the stock was qualified to fund the trust, or more specifically, whether the stock constituted Readily Marketable Securities as defined by paragraph 1.8 of the Agreement.[8] *See* Affidavit of Robert W. Viets ("Viets Aff."), Partner at EMM, ¶ 3. After concluding that neither Monoclonal nor Creative Classics stock were traded on a national or regional security exchange, EMM contacted the SVO for its opinion as to whether the stock constituted Readily Marketable Securities.[9] *See id.* ¶ 4. The SVO orally advised EMM that Alpine had made no application to the NAIC with respect to the stock, and in the absence of an application the NAIC did not consider the stock to be Readily Marketable Securities. *See id.* In light of this information, EMM advised BNY that the stock deposited by Alpine did not qualify to fund the trust. *See id.*

### 2. BNY's Resignation

On September 27, 1991, EMM reviewed the Agreement to determine the "consequences" of Alpine's inadequate funding. *See* Time Sheets. Three days later, EMM began to draft BNY's resignation letter. *See id.* On October 1, 1991, Viets and his associate, Stephen Franks, concluded that because of Alpine's inadequate funding, no trust was ever created. *See* Viets Aff. ¶ 5. The draft resignation letter reflected this conclusion and was forwarded to BNY. *See*

*id.* At that time, EMM further advised BNY that pursuant to paragraph 3.6 of the Agreement, BNY was entitled to rely on EMM's advice as complete authority for the "basis and method of its resignation [from the trust] . . . ." *Id.* On October 2, 1991, BNY sent its official resignation letter to Alpine, which provided in pertinent part:

Dear Mr. Benton:

We have been orally advised by the Securities Valuation Office of the NAIC that neither the 3,200,000 shares of Monoclonal Medical, Inc. nor the 500,000 Shares of Creative Classics International, which constitute all the securities delivered by Alpine Assurance Ltd. under the above-referenced Agreement . . ., constitutes Readily Marketable Securities as required by the Agreement. Accordingly, no Trust Fund was ever created or now exists.

This letter constitutes our notice of resignation, as Trustee, effective immediately. Given the non-existence of a Trust Fund, we have been advised by our counsel that the requirement that our resignation be delayed pending the acceptance of appointment by a Successor Trustee or the delivery to the Domiciliary Commissioner or with a court of proper jurisdiction is of no force or effect.

Resignation Letter, Ex. B to Fruchtman Aff.[10]

---

7. The Monoclonal and Creative Classics stock are referred to collectively as the "stock."

8. "Readily Marketable Securities" refers to securities that are readily marketable on regulated United States national or principal regional security exchanges or those determined by the Securities Valuation Office ("SVO") of the NAIC to have substantially equivalent liquidity characteristics. *See* Paragraph 1.8 of the Agreement.

9. EMM telephoned the SVO on September 30 and October 1, 1991. *See* Time Sheets, Ex. A to Viets Aff.

10. The letter also requested instructions as to where the stock deposited in the trust fund should be returned. *See* Resignation Letter. After receiving no response from Alpine, BNY returned the stock to Alpine's address on file. *See* 11/7/91 Letter, Ex. C to Fruchtman Aff.

### 3. BNY's Notice of Resignation

#### a. Notice to James Hilbrant

On October 14, 1991, James Hilbrant, a California surplus lines broker, requested written verification from BNY of an Alpine trust fund with a value of at least $5.4 million. *See* Hilbrant Letter, Ex. D to Fruchtman Aff. On October 17, 1991, BNY informed Hilbrant that BNY had resigned as trustee and was in the process of returning the trust's assets to Alpine. *See* 10/17/91 Letter, Ex. E to Fruchtman Aff. On February 1, 1993, Hilbrant sold an Alpine insurance policy to Albert Knoll d/b/a A.G. Knoll Trucking ("A.G.Knoll"). *See* Def. 56.1 ¶ 23. Approximately two weeks later Black was injured in a car accident in California by an employee of A.G. Knoll. *See id.*

#### b. Notice to the NAIC and the California Department of Insurance

On January 28, 1992, Maximiliane Moody, an employee working in the NAI-IO division of the NAIC, requested that BNY "certify the existence and value of the [Alpine] Trust Account as soon as possible." *See* Moody Letter, Ex. F. to Fruchtman Aff. In response, on February 11, 1992, BNY informed the NAIC by letter that it had "resigned as Trustee ... and returned to Alpine ... any and all securities tendered to [BNY] to be held [in trust]." Notice Letter to NAIC, Ex. G to Fructman Aff. The NAIC forwarded this letter to the California Department of Insurance three days later. *See* Def. 56.1 ¶ 27.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-al fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law[,] [while] [a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.2000) (internal quotations and citations omitted).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, 238 F.3d 145, 149–50 (2d Cir.2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). However, the non-moving party may not "rest upon ... mere allegations or denials." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir.2000). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir.1999); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal quotations, citations, and alterations omitted).

## III. DISCUSSION

BNY moves for summary judgment on four separate grounds. *First*, BNY as-

serts that plaintiffs' claims are barred by the statute of limitations. *Second*, BNY maintains that Craig, as liquidator of Alpine, "steps into Alpine's shoes" and can enforce only those rights that Alpine would have had against BNY if it were still in existence. Thus, BNY argues that Craig cannot establish a prima facie cause of action for breach of fiduciary duty because neither Alpine nor Craig suffered any damages.[11] Further, BNY maintains that all contractual or equitable defenses it has against Alpine apply to Craig as well. *Third*, BNY asserts that the Agreement expressly precludes Black, and any other policy holder or third-party claimant, from suing BNY. *Fourth*, BNY argues that plaintiffs' claims for equitable relief[12] are groundless given that BNY has turned over its entire file relating to the Agreement and the purported trust fund no longer exists.

## A. Statute of Limitations

Plaintiffs allege that BNY breached both its fiduciary duties as trustee and the provisions of the Agreement entered into with Alpine. With respect to the breach of fiduciary duty claim, New York applies either a three year or six year statute of limitations, depending upon the substantive remedy sought by the plaintiff. *See Bastys v. Rothschild*, No. 97 Civ. 5154, 2000 WL 1810107, at *33–34 (S.D.N.Y. Nov.21, 2000); *Svenska Finans Int'l v. Scolaro, Shulman, Cohen, Lawler & Burstein*, 37 F.Supp.2d 178, 183–84 (N.D.N.Y.1999); *see also Loengard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262, 266, 519 N.Y.S.2d 801, 514 N.E.2d 113 (1987). A claim alleging a breach of an express trust agreement is subject to a six year statute of limitations.

*See Klamberg v. Roth*, 473 F.Supp. 544, 557 (S.D.N.Y.1979) (finding a claim for breach of an agreement establishing a retirement trust to be essentially "an action on a contract" and subject to New York's six year period of limitations). Accordingly, the longest statute of limitations period that could be applied to either of plaintiffs' claims is six years.

In New York it is well established that claims accrue upon breach, not when an alleged breach is discovered. *See T & N PLC v. Fred S. James & Co. of New York, Inc.*, 29 F.3d 57, 58–60 (2d Cir.1994) ("Under New York law, a cause of action for breach of contract accrues and the statute of limitations commences when the contract is breached."); *see also Bastys*, 2000 WL 1810107, at *34 ("With respect to accrual, the rule in New York is that if a breach of fiduciary duty claim is not based upon fraud, the statute of limitation begins to run upon the breach, and not when the plaintiff discovers the breach.").[13] However, when an action involves an alleged breach by a trustee, the period of limitations does not begin to run until the trustee clearly and openly repudiates its obligations as trustee. *See In re Barabash's Estate*, 31 N.Y.2d 76, 80, 334 N.Y.S.2d 890, 286 N.E.2d 268 (1972). Furthermore, in light of the circumstances of a particular case, the trustee must make such repudiation known to the beneficiaries of the trust. *See id.*

The essence of the Complaint is that BNY accepted nonconforming assets (the stock) to fund the trust, failed to compel Alpine to turn over conforming assets, and then improperly resigned as trustee and returned the stock to Alpine in violation of

---

11. BNY's contention is based upon the fact that it returned all of Alpine's stock.

12. Plaintiffs' requests for relief are set forth at note 2, *supra*.

13. Plaintiffs do not allege that BNY engaged in fraud.

the Agreement. *See* Compl. ¶¶ 27–28, 30–33. Accordingly, the last act of BNY's purported breach occurred on November 7, 1991, when BNY returned the stock to Alpine without following the specified procedures set forth in the Agreement. Because this act occurred more than six years prior to the filing of this Complaint, the following questions must be answered: (1) when did BNY repudiate its role as trustee?; and (2) was BNY's repudiation sufficient to trigger the running of the statute of limitations?

### 1. BNY's Repudiation

BNY asserts that it repudiated its role as trustee on at least three occasions:

1. On October 2, 1991, BNY notified Alpine that no trust existed and it was immediately resigning as trustee. After BNY received no response from Alpine, it returned the stock to Alpine on November 7, 1991.

2. On October 17, 1991, BNY notified Hilbrant that it had resigned as trustee and was returning the stock to Alpine.

3. On February 11, 1992, BNY notified the NAIC of its resignation as trustee and its return of the stock to Alpine. On February 14, 1992, the NAIC forwarded this letter to the California Department of Insurance.

Memorandum of Law in Support of The Bank of New York's Motion for Summary Judgment at 9. BNY sufficiently repudiated its obligations as trustee on each of these occasions but surely no later than February 11, 1992, when it gave notice of its resignation to the NAIC.

### a. BNY's Notice of Resignation to the NAIC

 BNY's letter to the NAIC reads as follows:

> Dear Mr. Moody:
>
> This letter is to advise you of the status of the above-referenced Agreement (the "Agreement"). We have *resigned as Trustee* thereunder *and returned to Alpine Assurance, Ltd. any and all securities tendered to us to be held thereunder.*

Notice Letter to NAIC (emphasis added). This letter is clear and unambiguous. It states in no uncertain terms that BNY no longer considered itself trustee and it had returned the stock deposited in the trust back to Alpine. By resigning as trustee, BNY clearly repudiated its obligation to administer the trust. *See In re Jacobs' Estate*, 257 A.D. 28, 12 N.Y.S.2d 605, 606 (2nd Dep't 1939) (stating that it is well established that the "statutory period . . . does not begin to run until the administrator has openly repudiated his obligation to administer the estate.").

Plaintiffs argue that this repudiation was insufficient to trigger the running of the statute of limitations. They contend that the limitations period would only be triggered when BNY: (1) gave notice of its repudiation to all of the beneficiaries; or (2) complied with the appropriate resignation procedures set forth in paragraph 3.9 of the Agreement.[14] *See* Plaintiffs' Memo-

---

**14.** Plaintiffs also concede that BNY could have triggered the running of the statute of limitations on February 11, 1992, if its letter to the NAIC disclosed that the funds deposited into the trust were "bogus." *See* Transcript of 12/26/00 Hearing at 16. According to plaintiffs, this information would have triggered the policing mechanism of the NAIC and, in turn, the NAIC would have disseminated this information to the various insurance commissioners throughout the United States. *See id.* While this may be true, plaintiffs' submissions to the Court indicate that the sole reason why the NAIC was not "alarmed" by BNY's letter was "because three days later [it] was informed of the establishment of a new $5.4 million trust for Alpine at Ameritrust . . . ." Darwood Decl. ¶ 17.

randum of Law in Opposition to The Bank of New York's Motion for Summary Judgment ("Pl.Mem.") at 18. Plaintiffs are wrong on both counts.

*First,* under New York law, a trustee's repudiation must be "clear and made known to the beneficiaries *viewed in the light of the circumstances of the particular case." In re Barabash,* 31 N.Y.2d at 80, 334 N.Y.S.2d 890, 286 N.E.2d 268 (emphasis added). While the statute of limitations generally will not commence until a trust's beneficiaries receive notice of the trustee's repudiation, the particular circumstances of this case require an exception to the general rule. This action does not involve a typical trust agreement involving a limited number of beneficiaries. It involves a commercial trust whose beneficiaries more likely than not are unaware of its existence. Plaintiffs' argument that BNY was obligated to give notice to every policyholder and possible third-party claimant to an Alpine insurance policy is tenuous at best. Accepting plaintiffs' proposition would require BNY to give notice of its resignation to everyone in the United States (or for that matter, the world). This is clearly impossible.

BNY's letter to the NAIC unequivocally gave notice of its repudiation of its obligations as trustee, and was in fact forwarded to the California Department of Insurance on February 14, 1992. *See* Def. 56.1 ¶ 27. BNY never provided the NAIIO with any quarterly statements certifying the existence and value of the purported trust as required by paragraph 2.14 of the Agreement and the NAIC acknowl-

edged that BNY was not on its "Quarterly Listing" in a letter to the California Department of Insurance dated January 21, 1993. *See* 1/21/93 Letter, Ex. C to Affirmation of Daniel Mollin, Attorney for BNY. Moreover, the NAIC did not disseminate the information regarding BNY's resignation to other state insurance departments because it was notified that Alpine had established a second trust with Ameritrust. *See* note 14, *supra.*

As conceded by plaintiffs, the NAIC, an association whose membership is comprised of the insurance commissioners from each state, was established to "collect[ ] information about insurance companies, process[ ] this information into usable form by the insurance regulatory community, and act[ ] as an information clearing house for state insurance regulators." Def. 56.1 ¶ 9. The NAIIO, a division within the NAIC, was responsible for reviewing the assets deposited into the trusts established by off-shore insurance companies.[15] *See* Darwood Decl. ¶ 4. In light of these circumstances, BNY's notice of resignation to the NAIC was a sufficient repudiation to trigger the running of the statute of limitations.

*Second,* although the issue of BNY's compliance with the resignation procedures set forth in paragraph 3.9 of the Agreement would be relevant in determining whether a breach has occurred, it is not dispositive for statute of limitations purposes, which only require "proof of a repudiation which is clear and made known to the beneficiaries viewed in the light of the circumstances of the particular case."

---

**15.** The importance of the NAIC's role with respect to the trust at issue is supported by paragraphs 2.14 and 5.3 of the Agreement. As already noted, paragraph 2.14 requires the trustee to "certify the existence and value of the Trust Fund on a quarterly basis to NAI-

IO." Paragraph 5.3 states that any amendment to the Agreement must be signed by the Company and the trustee, and notice of such amendment shall be given to the NAIIO. The Agreement does not require that beneficiaries receive notice of amendments.

*In re Barabash,* 334 N.Y.S.2d at 893, 286 N.E.2d 268. Accordingly, plaintiffs' claims are time barred.

### B. BNY's Alternative Grounds For Summary Judgment

In addition to being time barred, plaintiffs' claims fail for the following reasons:

#### 1. As Liquidator Craig Has No Greater Rights Than Alpine

■ Under New York law the general rule is that the "liquidator of an insurance company 'stands in the shoes' of the insolvent, gaining no greater rights than the insolvent had." *In the Matter of the Liquidation of Union Indemnity Ins. Co. of New York,* 89 N.Y.2d 94, 109, 651 N.Y.S.2d 383, 674 N.E.2d 313 (1996) (quoting *Stephens v. American Home Assurance Co.,* 811 F.Supp. 937, 947 (S.D.N.Y.1993), *vacated and remanded on other grounds,* 70 F.3d 10 (2d Cir.1995)); *see also Bohlinger v. Zanger,* 306 N.Y. 228, 234, 117 N.E.2d 338 (1954); *Resolution Trust Corp. v. Massachusetts Mut. Life Ins. Co.,* 93 F.Supp.2d 300, 309 (W.D.N.Y.2000). While Craig does have standing to sue as Alpine's successor, his claims are barred for several reasons.

■ *First,* Alpine received notice of BNY's repudiation by letter dated October 2, 1991. Thus, Craig's claims are time barred. *Second,* because BNY returned the stock to Alpine, Alpine did not suffer any damages. Without any proof of damages to Alpine, Craig's claims for breach of fiduciary duty and breach of the trust agreement must fail. *See Whitney v. Citibank, N.A.,* 782 F.2d 1106, 1115 (2d Cir. 1986) (the elements of a breach of fiduciary duty claim are: a breach by a fiduciary of obligations to another; defendant's

knowing participation in the breach; and damages suffered by the plaintiff as a result of the breach); *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996) (the elements of a breach of contract claim are: the existence of an agreement; due performance of the contract by plaintiff; breach of the agreement by defendant; and damages). *Third,* Alpine's illegal and fraudulent conduct effectively bars Craig's claims. *See Smith v. Long,* 281 A.D.2d 897, 723 N.Y.S.2d 584, 586–87 (4th Dep't. 2001) (" '[U]nclean hands in participating in a course of conduct of deception and deceit is an effective bar' to causes of action to enforce the agreement that results from that deception and deceit.") (citation omitted).

#### 2. Black and the Class She and Craig Purport to Represent Lack Standing to Sue

■ Paragraph 3.2 of the Agreement states that the "[t]rustee's duties and responsibilities shall be determined solely by the express provisions of this Agreement and no other duties or responsibilities shall be implied." Paragraph 2.5 of the Agreement states:

> No Policyholder or Third Party Claimant shall have any right of any nature or description under this Agreement to seek to enforce a Claim or otherwise bring an action against the Trustee in respect of any assets of the Trustee or of any assets other than those in the Trust Fund. No Policyholder or Third Party Claimant, even after its claim has become a Matured Claim, may require an accounting from the Trustee or inquire into the administration of the Trust, question any of the Trustee's acts or omissions or otherwise enforce this agreement, the sole right of such Policy-

holder or Third Party Claimant under this Agreement being to receive the amount of its Claim after it has become a Matured Claim from the assets then in the Trust Fund and available for such payment under this agreement.

Together, these provisions make clear that policyholders and third-party claimants are prohibited from bringing any claims against BNY other than claims against the assets in the trust fund. As there are no assets in the trust fund, Black and the putative class she and Craig purport to represent lack standing to sue.[16]

## IV. CONCLUSION

For the reasons stated above, BNY's motion for summary judgment is granted and this case is dismissed. The Clerk of the Court is directed to close this case.

SO ORDERED.

ATLANTIC MUTUAL INSURANCE COMPANY, as subrogee of the shipper and consignee under Intermodal Bill of Lading Booking number HU 378 N 0350, Plaintiff,

v.

M/V HUMACAO, her engines, boilers, etc., Navieras De Puerto Rico; Puerto Rico Maritime Shipping Authority and NPR, Inc., Defendants.

NPR, INC., Third–Party Plaintiff,

v.

EMPIRE TRUCK LINES, INC., Third–Party Defendant.

No. 99 CIV. 10787(CSH).

United States District Court, S.D. New York.

April 27, 2001.

---

**16.** Plaintiffs argue that BNY is estopped from denying that the trust contains $5.4 million in assets because "BNY acknowledged to the regulatory community that it had received assets valued at $5.4 million, and then 'resigned' without disclosing the non-receipt of those same assets." Pl. Mem. at 23–24. Plaintiffs are wrong. BNY's only communication with the regulatory community was its notice to the NAIC that it had resigned as trustee. Further, the cases plaintiffs cite in support of their position, *see* Pl. Mem. at 24, stand for the limited proposition that estoppel may apply against those individuals or entities who actively participate in the misrepresentation of the value of the trust. That is not the case here. In addition, pursuant to paragraph 2.7 of the Agreement, BNY was entitled to rely on Alpine's instructions, and unfortunately, its misrepresentations. *See* Paragraph 2.7 of the Agreement ("[E]ach investment instruction from [Alpine] shall be a representation by [Alpine] that the investments specified therein meet such conditions imposed by the definitions set forth in this Agreement.").

Stephen A. Agus, New York City, for Atlantic Mutual Insurance Co.

John K. Fulweiler, Jr., De Orchis, Walker & Corsa LLP, New York City, for Navieras De Puerto Rico and NPR Inc.

Robert T. Whittaker, Martin, Clearwater & Bell, New York City, for Empire Truck Lines, Inc.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Atlantic Mutual Insurance Company ("Atlantic Mutual") brought this complaint in admiralty as subrogee of its insured, Johnson & Johnson Medical Inc. ("J & J Medical"), to recover the amount of a claim it paid to J & J Medical under J & J Medical's insurance policy with Atlantic Mutual. The $95,342.50 claim represented the value of 5566 cases of damaged bandage dressings that defendants had agreed, pursuant to a bill of lading, to transport from the port of San Juan, Puerto Rico to J & J Medical's facility in Sherman, Texas. The complaint alleges that the shipment of dressings was loaded on the M/V HUMA-CAO, which was owned and/or controlled by defendant NPR, Inc. ("NPR"). The vessel sailed from San Juan on April 25, 1998 and arrived at the Port of Jacksonville, Florida on April 28, 1998. From Jacksonville, NPR transhipped the shipment by rail to Dallas, Texas where it was allegedly misplaced. The shipment was not located until June 10, 1998, by which time the bandages' sterilization deadline had expired, rendering them worthless.

NPR denies responsibility for damaging the bandages and has filed a third-party complaint against Empire Truck Lines, Inc. ("Empire"), alleging that liability for the damage belongs wholly or at least in part to Empire. The third-party complaint alleges that NPR safely delivered the goods to the rail yard in Dallas, Texas on May 1, 1998, at which point it engaged Empire pursuant to an existing Equipment Interchange Agreement (the "Agreement") to transport the shipment by truck from the rail yard to J & J Medical's facility in Sherman, Texas. According to the third-party complaint, Empire breached the Agreement by causing "the container shipment to remain at the rail yard and/or otherwise fail[ing] to perform according to the terms of the [Agreement]." Third-Party Complaint at ¶ 9. NPR avers that as a result of its breach and/or negligence Empire should be required to indemnify or pay contribution to NPR for any amount NPR may be required to pay Atlantic Mutual in this action, and in addition that Empire should be adjudged directly liable to Atlantic Mutual pursuant to Fed. R.Civ.P. 14(c).[1] *Id.* at p. 4.

---

1. Rule 14(c) provides that when "a plaintiff asserts an admiralty or maritime claim," the defendant "may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences. In such a case the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff ... and the action shall proceed as if the plaintiff had commenced it against the third-

party defendant as well as the third-party plaintiff."